(No. 11628.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* F. B. STOKES, Plaintiff in Error.

*Opinion filed December 19, 1917.*

1. CONSTITUTIONAL LAW—*the legislature has broad discretion in making classifications for police regulation.* The legislature has a broad discretion in making classifications for police regulation, and the requirement of the constitution that laws shall be general does not mean that every statute shall have effect upon every individual and in every locality.

2. SAME—*presumption is in favor of validity of doubtful police regulation passed to meet existing evils.* It is for the legislature to determine when the conditions exist calling for the exercise of police power to meet existing evils, and when the legislature has acted the presumption is that the act is a valid exercise of such power.

3. SAME—*Loan Shark act of 1917 is not unconstitutional.* The Loan Shark act of 1917, (Laws of 1917, p. 553,) permitting a higher rate of interest than seven per cent per annum for the loan of sums of $300 or less in case the lender shall comply with the provisions of the act and secure a license for such business, is not invalid as making an unlawful classification or as improperly abridging the right to contract, but is a valid exercise of the police power of the State to regulate the business of making small loans and remedy the existing evils connected therewith. (*Massie* v. *Cessna,* 239 Ill. 352, distinguished.)

4. SAME—*purpose of constitutional provision against including subjects not expressed in title of act.* The purpose of the constitutional provision that an act shall not include subjects not expressed in its title is not to require the title to be an index of the subject matter but merely to indicate the general subject matter so as to prevent fraud upon the public by the insertion of provisions not so indicated; and this purpose may be served by a title expressing either a brief, general statement of the objects of the act or the principal features of the act more in detail.

5. SAME—*the title of the Loan Shark act sufficiently indicates subject matter.* The subject matter of the Loan Shark act of 1917 is sufficiently indicated by its title, even though it does not refer to the exceptions mentioned in section 5a nor to the repealing clause of the act, and though the act itself, while purporting to regulate the "business of making loans," is so drawn as to include a single transaction.

6. SAME—*Loan Shark act is not an amendment of the Interest law.* The Loan Shark act is complete in itself and is intended to regulate the business of making loans of small sums of money, and the fact that it incidentally contains a provision as to rates of interest does not render the act an amendment to the Interest law.

7. SAME—*Loan Shark act does not confer judicial powers upon the department of trade and commerce.* The provision of the Loan Shark act of 1917 giving to the department of trade and commerce the power to license and regulate the business of making small loans, as provided in the act, and incidentally giving the right to determine whether or not an applicant for such license possesses the qualifications required by law, is not a grant of judicial powers within the meaning of the constitution.

WRIT OF ERROR to the Municipal Court of Chicago; the Hon. HARRY M. FISHER, Judge, presiding.

CLARK & CLARK, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and CLARENCE N. BOORD, (R. K. WELSH, CHARLES R. NAPIER, F. R. HUBACHEK, and GEORGE C. BLISS, of counsel,) for the People.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This is a writ of error to review the judgment of the municipal court of the city of Chicago finding plaintiff in error guilty of violating the provisions of the act of June 14, 1917, in force July 1, 1917, regulating and licensing the business of making loans in sums of $300 or less, commonly known as the Loan Shark act. The information was filed on July 20, 1917, charging plaintiff in error with willfully and unlawfully making a loan of $100 to Clarence W. Miller and contracting for and receiving a greater rate of interest than seven per cent per annum, viz., eight and one-third per cent per month, without obtaining a license of the department of trade and commerce, as provided by such act. A plea of not guilty was entered, a jury was waived and the cause submitted to the court for trial. Plaintiff in error was found guilty and a fine of $50 imposed.

There is no dispute as to the facts. On July 17, 1917, plaintiff in error loaned Clarence Miller, a salesman for the C. F. Adams Company, $100, payable in installments of $25 each until $150 was paid, with interest at ten per cent per month. Miller gave his note for $150 and received $100 in cash, at the same time making an assignment of his wages to plaintiff in error. It was admitted that plaintiff in error is engaged in the business of loaning money in the city of Chicago in sums less than $300 and that he had no license, as required by the provisions of said act.

The only ground urged for a reversal of the judgment is the alleged unconstitutionality of the act, which is entitled "An act to license and regulate the business of making loans in sums of three hundred dollars ($300) or less, secured or unsecured, at a greater rate of interest than seven (7) percentum per annum, prescribing the rate of interest and charge therefor and penalties for the violation thereof, and regulating the assignment of wages or salaries earned or to be earned, when given as security for any such loan." (Laws of 1917, p. 553.)

The first section of the act provides that it shall be unlawful to make any loan of money, credit, goods or things in action in the amount or value of $300 or less, whether secured or unsecured, and to charge, contract for or receive a greater rate of interest than seven per cent per annum without a license from the department of trade and commerce. Application for such license shall be in writing, giving the name, address and place of business of the applicant, and he shall pay an annual license fee of $50, which shall be in full of all expenses of examination and administration under the act. He shall give a bond in the sum of $1000, with one or more sureties to be approved by said department, conditioned that he will conform and abide by the provisions of such act, and pay to the State, or such person or persons as may be entitled thereto, all sums of money that may become due or owing to the State or to such per-

son under and by virtue of the provisions of such act. On the filing and approval of said bond a license shall issue to the applicant to make loans, in accordance with the provisions of the act, for a period which shall expire on the first of January next following the date of issuance of such license. The section further provides that if in the opinion of the department of trade and commerce the bond shall at any time become insecure an additional bond in the sum of $1000 may be required, and that upon failure to file such bond the license shall be revoked. Upon notice to the licensee and an opportunity to be heard the department may revoke such license if the licensee has violated any provisions of the act, and in case he shall be convicted by a court a second time of the violation of section 2 of the act the department shall revoke such license, and another license shall not issue to such licensee if the second offense occurred after a prior conviction. The section further provides that for the purpose of discovering violations of the act the department of trade and commerce may at any time investigate the loans or business of every licensee, and shall have access to the books, papers, records and vaults of such licensee, and have authority to examine, under oath, all persons whose testimony it may require relative to such business, and the licensee shall keep such books and records as in the opinion of the department will enable it to determine whether or not the provisions of the act are observed.

Section 2 provides that every licensee may loan any sum of money, goods or things in action not exceeding in amount or value $300, and charge, contract for and receive interest thereon at a rate not to exceed three and one-half per cent per month, which shall not be payable in advance or compounded and shall be computed on unpaid balances, and no further charge whatsoever for any examination, service, brokerage, commission or attorney fee, except for foreclosure or entering of judgment. In no case shall a greater amount than ten per cent of the amount found due be di-

rectly or indirectly charged, contracted for or received, except the lawful fees actually and necessarily paid out to any public officer for filing or recording in a public office any instrument securing the loan.   If interest or charges in excess of those permitted by the act should be charged, contracted for or received the contract or loan shall be void, and the licensee shall have no right to collect or receive any principal, interest or charge whatsoever.   No person shall owe any licensee at any time more than $300 for principal.

Section 3 provides for the delivery to the borrower of a statement of the amount and date of the loan, when due, the rate of interest charged, the nature of security given, and for the surrendering of the note, together with any mortgage or pledge given, when the loan is paid.   It prohibits the licensee from taking any power of attorney except to confess judgment, or from taking a note or promise to pay which does not state the actual amount of the loan, the time for which made and rate of interest, or any instrument in which blanks are left to be filled after execution.

Section 4 provides that no assignment of any salary or wages earned or to be earned, given to secure any loan, shall be valid unless in writing, signed by the borrower, nor unless it shall be given to secure an existing debt or one contracted simultaneously with its execution, and that under such assignment or order for payment of such future salary or wages, given as security for a loan under the act, fifty per cent of the borrower's salary or wages may be collectible by the licensee from the time a copy of such assignment, verified by the oath of the licensee or his agent, together with a verified statement of the amount unpaid on such loan, has been served on the employer.

Section 5 provides that any person who shall, directly or indirectly, violate any of the provisions of the act shall be guilty of a misdemeanor, and upon conviction shall be punishable by a fine of not more than $500 or by impris-

onment not more than six months, or both such fine and imprisonment, in the discretion of the court.

Section 5*a* provides the act shall not apply to any person, co-partnership or corporation doing business under any law of this State or of the United States relating to banks, trust companies, building and loan associations or pawn-brokers, or to wage loan corporations organized under the act to provide for the incorporation, management or regulation of wage loan corporations, approved June 20, 1913, in force July 1, 1913.

The grounds urged against the constitutionality of the act are: (1) That it violates section 1 of the fourteenth amendment to the constitution of the United States and section 2 of article 2 of the constitution of this State, in that it is class legislation and abridges the privileges and immunities of citizens of the United States and deprives them of their property without due process of law; (2) that it grants to a corporation, association or individual a special or exclusive privilege, immunity or franchise, in violation of section 22 of article 4 of the constitution of this State; (3) that the act embraces more than one subject not expressed in its title, and is a local or special law regulating the rate of interest, in violation of sections 13 and 22 of article 4 of the constitution of this State; and (4) that it vests the department of trade and commerce with judicial powers, in violation of section 1 of article 6 of the constitution of this State.

The first two contentions will be considered together. The argument advanced in support of them is, that the act divides the citizens of this State into two classes,—one class to which plaintiff in error belongs, and the other the excepted class mentioned in section 5*a* which is prohibited from engaging in such business; that such classification is without any real foundation in fact and is arbitrary and unreasonable; that it confers special privileges and immunities on the first class which are not and cannot be enjoyed

by the second class; also that it abridges the right to contract, in that it prohibits the lender from loaning to any borrower more than $300, or any amount to a creditor who may be indebted to him on account of merchandise purchased to that amount, and prohibits the borrower from contracting for more than fifty per cent of his salary as security for such loan.

The right of the State to regulate the rate of interest which may be charged for the loan of money and to provide penalties for its violation is too firmly established to be questioned. The extent to which the legislature may go in making classifications for the purpose of such legislation has been passed upon frequently by the Supreme Court of the United States and of this and other States. In *Griffith* v. *Connecticut*, 218 U. S. 563, a statute of Connecticut which prohibited the exacting of more than fifteen per cent per annum on loans and exempted from its operation banks, trust companies and *bona fide* mortgages was held not to infringe any of the rights guaranteed by the fourteenth amendment to the Federal constitution. In that case it was pointed out that the matter of interest charges which might be made for the use of money loaned was vested in the legislature of each State, and that in regulating such charges and making classifications for the purpose of exceptions the legislature was vested with a broad discretion, which would not be disturbed "unless such regulations are so unreasonable and extravagant as to interfere with property and personal rights of citizens unnecessarily and arbitrarily;" that "so long as such classification has a reasonable basis and is not merely an arbitrary selection, without real difference between the subjects included and those omitted from the law," it would not be obnoxious to the constitution, as denying to citizens the equal protection of the laws. It was there further said: "The General Assembly, in respect to the matter of usury, had the right to deal with different classes of money lenders or money borrowers in a different

way, provided there was nothing apparently unreasonable in creating such distinctions and all .the members of each class were treated in the same manner."

In *Mutual Loan Co.* v. *Martell,* 222 U. S. 225, the court sustained the validity of the classification made in the Massachusetts law by which any assignment or order for wages to be earned in the future to secure a loan of less than $200 was made invalid unless the assignment had been accepted in writing by the employer and filed for record. That act excepted from its provisions national banks and banks which were under the supervision of bank commissioners, and certain loan companies. It was there said: "We have declared so often the wide range of discretion which the legislature possesses in classifying the objects of its legislation that we may be excused from a citation of cases. We shall only repeat that the classification need not be scientific nor logically appropriate, and if not palpably arbitrary and is uniform within the class it is within such discretion. The legislation under review was directed at certain evils which had arisen, and the legislature considering them and from whence they arose might have thought or discerned that they could not or would not arise from a greater freedom to the institutions mentioned than to individuals. * * * But even if some degree of evil which the statute was intended to prevent could be ascribed to loans made by the exempted institutions their exemption did not make the law unconstitutional. Legislation may recognize degrees of evil without being arbitrary, unreasonable or in conflict with the equal protection provision of the fourteenth amendment to the constitution of the United States." To the same effect are *Rast* v. *VanDeman & Louis Co.* 240 U. S. 342; *Hall* v. *Geiger-Jones Co.* 242 id. 539; *State* v. *Sherman,* 18 Wyo. 169; *Wessell* v. *Timberlake,* (Ohio,) 116 N. E. Rep. 43; *State* v. *Ware,* 79 Ore. 367; *In re Stephens,* 170 Cal. 48; *King* v. *State,* 136 Ga. 709; *Cavanaugh* v. *People,* 61 Colo. 292.

The same rule has been uniformly adhered to in this. State when a similar question has arisen. Whenever the question has been raised it has been uniformly held that the legislature is vested with a broad discretion in making classifications for police regulation, and that "the requirement that laws shall be general does not mean that every statute shall have effect upon every individual and in every locality in the State," and that "a law does not cease to be general because it classifies persons or places, if the basis of classification is necessary to the purpose to be accomplished by the legislation or reasonably appropriate for that purpose." (*People* v. *Kaelber*, 253 Ill. 552.) "The general rule is, that a classification will suffice as a basis for legislation if such classification is based upon a rational difference of situation or condition found to exist in the persons or objects upon which the classification rests." (*People* v. *Nellis*, 249 Ill. 12.) In *People* v. *Kewanee Light Co.* 262 Ill. 255, we said: "An act which is general in its nature and uniform in its operation upon all persons coming within its scope is a general law. * * * A law is general, not because it embraces all of the governed, but because it embraces all who are similarly situated and who come within its provisions." In *Lasher* v. *People*, 183 Ill. 226, we held valid the provisions of a statute regulating the shipping, consignment and sale of produce, fruits, vegetables, butter, eggs, poultry, etc., in cities of fifty thousand and over, which excepted grain, live stock and dressed meats from its provisions, and there said: "The legislature have power to form classes for the purpose of police regulation if they do not arbitrarily discriminate between persons in substantially the same situation. * * * The commission merchants dealing in the kinds of produce named in this act, which constitute the small products of the farm, are of a different class from those who transact business in the great markets for the sale of grain, live stock and dressed meats. * * * The law which classifies small commission mer-

chants engaged in the produce commission business rests upon a reasonable ground as a basis for the classification. Such a business may afford great opportunities for swindling and be productive of great abuses, and the legislature may properly· enact a law applying to cities of such size as in the legislative judgment would permit the growth and existence of such abuses." The same doctrine was announced in *Engel* v. *O'Malley,* 219. U. S. 128, where the validity of the New York statute was sustained which prohibited any individual or partnership from engaging in the business of receiving deposits of money for safe keeping or transmission to another without a license, and exempted from its provisions corporations or individual bankers authorized to do business under the banking laws, national banks, hotel keepers, express or telegraph companies and individuals or partnerships, where the average amount of each sum received on deposit or for transmission was not less than $500 during the fiscal year, and those which had given bonds as provided for by such act. In sustaining the validity of such classification the court said: "Legislation which regulates business may well make discriminations depend upon the degree of evil. (*Heath & Milligan Manf. Co.* v. *Worst,* 207 U. S. 338; 52 L. ed. 236; 28 Sup. Ct. Rep. 114.) It is true, no doubt, that where size is not an index to an admitted evil the law cannot discriminate between the great and small, but in this case size is an index. Where the average amount of each sum received is not less than $500, we know that we have not before us the class of ignorant and helpless depositors, largely foreign, whom the law seeks to protect.—See *Muscow* v. *United States Surety Co.* 196 N. Y. 456-465; 134 Am. St. Rep. 851; 90 N. E. Rep. 171; *McLean* v. *Arkansas,* 211 U. S. 539; 53 L. ed. 315; 29 Sup. Ct. Rep. 206."

It is a familiar rule that "legislation should be adapted to meet existing conditions, and that evils are to be met as they arise and according to the manner in which they arise."

(*Heath & Milligan Manf. Co.* v. *Worst, supra; State* v. *Sherman, supra.*)  Also, that in the exercise of the police power of a State it is for the legislature to determine when the conditions exist calling for the exercise of that power, and that when the legislature has acted the presumption is that the act is a valid exercise of such power.  (*People* v. *McBride,* 234 Ill. 146.)  In case of doubt every intendment is to be taken in favor of the validity of such enactment. (*People* v. *School Directors,* 267 Ill. 172.)  As said in *People* v. *Elerding,* 254 Ill. 579: "When the legislative authority has decided an exigency exists  *  *  *  and has adopted an act to meet the exigency, the presumption is that it is a valid enactment, and courts will sustain it unless it appears, beyond any reasonable doubt, that it is in violation of some constitutional limitation.  (*People* v. *McBride,* 234 Ill. 146.)  In determining the validity of legislation for the purpose for which the act under consideration was adopted, courts may take into consideration that members of the legislature come from every part of the State and from the various callings and vocations of life, and may be presumed to have observed and become acquainted with existing conditions, the course of business, the manner in which it is conducted and how the public interest is affected thereby.  (*Munn* v. *People,* 69 Ill. 80; *Wenham* v. *State,* 65 Neb. 394; 58 L. R. A. 825.)  These considerations, in a case of doubtful validity of a statute, are sufficient to turn the scales in favor of the validity of the act. It is worthy of note that twenty-seven States have enacted laws limiting the hours of employment of females in certain lines, and five States besides Illinois have enacted laws limiting the hours they may be employed in hotels."  The same may be said of legislation of the character involved here, which has been adopted with various forms of classifications in something like sixteen different States, and almost universally sustained by the courts of last resort in such States under similar constitutional provisions.

That evils exist with respect to small loans which are not common to other loans was well pointed out in the case of *State* v. *Sherman, supra.* In that case the statute of Wyoming made it unlawful for any person, corporation, association or partnership to receive or contract for any greater interest than twenty-five per cent per annum upon any loan of a sum less than $200. The court, after re-viewing the leading cases on the subject, sustained the va-lidity of such classification and said: "It is a matter of common knowledge, upon which the legislature is to be presumed to have acted, that in this State, at least, the taking of interest much in excess of the rate allowed by law was customarily practiced by those engaged in the business of making small loans, usually made under such circum-stances to persons of small means, who by reason of their actual or supposed necessities are compelled to deal with and yield to the demands of those engaged in that business. And it may be the fact,—at least we are not advised to the contrary,—that the practice of exacting such oppressive rates of interest is very largely, if not entirely, confined to the class of persons and transactions referred to. There would thus appear to be a substantial difference between that class and others with respect to the rate of interest demanded and received. The act fixes the dividing line be-tween the class affected by it and the persons and transac-tions excluded, at the sum of $200. It is evident that, in-tending to cover the condition above mentioned, a dividing line was necessary to prevent uncertainty, and in that respect much must be left to the discretion of the legislature. It would seem, indeed, that the maximum amount named is large enough to reach the practice deemed to be oppressive to the borrower and injurious to the public, and that a per-son requiring the loan of a larger sum would, ordinarily at least, be in a position of greater freedom in the matter of agreement as to the rate of interest as well as in the se-lection of the person with whom to arrange for the loan.

* * * The business is so well advertised and known that the legislature, we think, was justified in regarding and treating it, and the persons engaged in it, as constituting a distinct class in the field of financial operations, and had the power to enact the statute here in question to suppress the practice, conceived by the legislature to be oppressive and extortionate, growing out of the conduct of such business and such transactions. In our opinion, therefore, the statute is not unconstitutional on the ground of arbitrary or unreasonable classification. As a general law it has a uniform operation, for the reason that it applies equally to all persons in the class and under like circumstances and conditions."

The case of *Massie* v. *Cessna,* 239 Ill. 352, is not in conflict with the above view. In that case an act of the legislature which rendered invalid an assignment of wages or salary unless it was in writing and signed by the assignor and duly acknowledged before a justice of the peace and entered upon his docket and notice thereof served upon the employer was held unconstitutional on the ground it applied not only to the wages of artisans, mechanics, laborers and others employed in various manual occupations, but also to salaries and compensation for personal services of highly salaried officers of corporations and public officers who were not in need of the protection of laws of that kind; also for the further reason it made an assignment of wages given as security for a usurious loan void, while the law of the State made no such provision with reference to other instruments given as security for such loans. It was, however, there pointed out that wage earners were the proper objects of legislation which would tend to protect them from the evils which this statute was designed to prevent, and that such an act would not be rendered invalid because it placed reasonable limitations upon the right to assign such wages as security for an indebtedness and prescribed a reasonable method to be pursued in making such an assign-

ment effective. It was further pointed out that it was undoubtedly true many persons who were salaried received compensation no greater in amount per month or year than that received by some wage earners, and that the question as to whether or not a statute protecting a salary not greater in amount than a certain sum per week or month, or protecting a portion of such salary not in excess of a certain sum per month or week, would be valid, was not before the court for decision. The language of the opinion, however, indicates a statute of that character would be valid. In this instance the statute under consideration obviates the objections there pointed out by limiting the amount of wages or salary which may be assigned to a sum not exceeding $300 and not to exceed fifty per cent of the salary earned per month, and in that way protects the small-salaried person, equally with the wage earner, as effectively as if it had provided that wage earners, and salaried employees not receiving more than a certain sum per week or month, should be included within its provisions. The limit here placed upon the amount of such wages or salary which may be assigned meets the objection there pointed out to the statute then under consideration. The statute there under consideration made the instrument void irrespective of the usurious rate of interest charged, and no provision was made by which a higher rate of interest than that allowed on other instruments and loans might be charged. It thereby discriminated between loans made on an assignment of wages or salary and those made on an assignment of other instruments. In the instant case the statute authorizes loans to be made on this particular kind of security to a limited amount and at a higher rate of interest than is allowed upon loans made upon other securities, and for this purpose makes a distinct classification of such loans and the manner in which they are to be made. It was within the power of the legislature to provide regulations for this class of business, the rate of interest which might be charged and the penalties for those

who undertook to engage in it without complying with the regulations prescribed by such act, and in the exercise of the police power invested in it by the constitution the legislature had the power. to declare all contracts entered into in violation of its provisions contrary to the public policy of the State and void.  The act in question does no more than this.  It does not abridge the right to contract except for usurious interest, but leaves all parties free to contract with anyone for a loan at a rate of interest not to exceed seven per cent, or for the higher rate of interest with all who choose to bring themselves within the provisions of the act.

In support of the third contention it is urged that the act includes special matters which are not expressed in the title, in that the title of the act indicates it is directed against "the business of making loans," while the act itself is so drawn as to include a single transaction; also, that by section 5a banks, trust companies, loan associations, pawnbrokers and wage loan corporations are excluded from its operation, and by section 6 all laws inconsistent with its provisions are repealed, neither of which subjects is mentioned in the title of the act.  The objection that a statute includes matters which are not expressed in the title of the act is one which is frequently urged and seldom sustained. The reason for this is that they are usually frivolous and without merit.  The object of the constitutional provision was not to hinder legislation or require that the title of an act should be an index to the subject matter which followed and minutely and exactly express every related matter which was included in the act, (*People* v. *Solomon,* 265 Ill. 28,) but, on the contrary, was intended to require the title of the act to express in general terms the objects and purposes of the act, so as to prevent surprise or fraud by the insertion of provisions into an act of which the title gave no intimation, and to apprise the people, through the usual course of publication of legislative proceedings, of the subject matters of legislation being considered.  (*Galpin* v.

*City of Chicago,* 269 Ill. 27.) This may be done either by expressing in the title in a brief, general statement the objects and purposes of the act, or by so framing the title as to express the principal features of the act more in detail. (*Perkins* v. *Commissioners of Cook County,* 271 Ill. 449; *People* v. *Sayre,* 246 id. 382; *People* v. *Sargent,* 254 id. 514.) Either method adopted will answer the requirements of the constitution so long as the general subject matter of the legislation is fairly indicated. In this act the subject matter is fairly indicated by its title, and the provision against making a single loan may fairly be said to come within the purview of the title of the act. The same may be said as to the further contention that the act is void for the reason it exempts those mentioned in section 5*a* from the provisions of the act without specific mention of such exceptions in the title. Legislation of this character is not infrequent. In any event, plaintiff in error has not brought himself within the exempted class, and even if he had and the provisions making such exemption were to be held void for this reason, such fact would not render the whole act void but only such provisions void. (*People* v. *Solomon, supra.*) In *Timm* v. *Harrison,* 109 Ill. 593, it was held that the repeal of a statute on a given subject was so connected with the subject matter of the new statute on the same subject that the repealing section in the new statute would be valid notwithstanding the title was silent on that subject. None of these objections are well taken.

There is a further contention that the act is void as a special or local law regulating the rate of interest on money loaned, or if it is not subject to this objection that it is an amendment of the interest laws, and void as such for the reason the constitution requires that when an act is an amendment of another act the amended act shall be inserted at length in the new law. The object of the law is not to regulate the rate of interest, but, on the contrary, is to regulate the business of making loans of small sums of

money to wage earners and salaried people, and the provision as to the rate of interest is only inserted as one of the incidents of such regulation. The act is in no sense an interest statute. It is a full and complete act in itself, regulating the business of making small loans. It prescribes the conditions under which such business may be conducted and the manner of obtaining a license to conduct the same, for State inspection and supervision, and, in fact, provides a complete system for the regulation of such business. The provision with respect to interest is a general one, which applies to all who choose to come within its provisions. It is not a special or local law regulating the rate of interest or one amending the interest statute. It is a complete law within itself and not dependent upon the provisions of any other act for its enforcement. It therefore is in no sense an amendment of the Interest law and cannot be held void as such.

It is further urged that the act is void as it confers judicial powers upon the department of trade and commerce with respect to requiring an additional bond if in its opinion the bond given is insecure, exhausted or otherwise doubtful, vests it with power to revoke the license if any licensee violates any of the provisions of the act, and empowers it to call and examine persons on oath for the purpose of ascertaining whether or not the licensee is complying with the act. While the powers conferred are in a sense of a judicial nature, they are not judicial powers in the sense those words are used in our constitution. No power is conferred upon the department to adjudicate upon the rights and interests of parties or to construe and apply the law. The sole power granted is to license and regulate the business, which carries with it, as a necessary incident, the right to determine whether or not the applicant for such license possesses the qualifications required by law and is a fit person to conduct such business. While the determination of such question requires the exercise of judgment and discre-

tion, and to that extent is of a judicial nature, it is not judicial power as contemplated by the provisions of the constitution referred to. The only power the department has is to grant licenses and approve the bonds, and after a license has been granted to make an investigation for the purpose of determining whether or not the bond given is sufficient and whether or not the licensee is conducting the business in the manner required by the act. For the purpose of ascertaining these matters the department is vested with the power of calling witnesses and examining them on oath, and of examining the books, papers, records, etc., of the licensee, and when it is found the licensee is an unfit person by reason of his violating the act, to revoke such license. But the act confers no power upon such department to determine any other matters or questions, except, alone, the single question as to whether or not the licensee is complying with the provisions of such act. The granting of such powers to ministerial officers has never been held to invest them with judicial powers, within the meaning of our constitution. (*People* v. *Apfelbaum,* 251 Ill. 18; *Block* v. *City of Chicago,* 239 id. 251; *Klafter* v. *Examiners of Architects,* 259 id. 15.) We cannot so hold in this case. If any licensee deems himself aggrieved by the acts of the department in revoking his license and contends that his license has been revoked without proper cause, he would have an unquestioned right to resort to the courts to compel a restoration of his license and have his rights in the premises adjudicated by a court of law irrespective of the determination of the department of commerce and labor in the premises. It therefore cannot well be said the act is void as an unwarranted delegation of judicial power.

As we are of the opinion that the act, as a whole, is a valid exercise of legislative power, the judgment of the municipal court will be affirmed.          *Judgment affirmed.*