[No. 31620, 31621.  *En Banc.*  May 8, 1952.]

HOUSEHOLD FINANCE CORPORATION, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*[1]

[1]Reported in 244 P. (2d) 260.

*McMicken, Rupp & Schweppe* (*Hubachek & Kelly*, of counsel), for appellant.

*The Attorney General, Fred L. Harlocker, Assistant,* and *Kenneth A. Cole, Special Assistant,* for respondent.

DONWORTH, J.—Household Finance Corporation, appellant here, appealed to the superior court for Thurston county from orders of the supervisor of banking which denied its applications for licenses for a place of business in Vancouver and for a second place of business in Seattle.

The Washington small loan act (Laws of 1941, chapter 208, p. 609; Rem. Supp. 1941, §§ 8371-1 to 8371-27, inclusive)

provides that any aggrieved applicant for a license may appeal to the superior court for Thurston county. The appeal section is as follows:

"Whenever the Supervisor [of Banking] shall deny an application for a license or shall revoke or suspend a license issued pursuant to this Act, or shall issue any specific order or demand, then such applicant or licensee thereby affected may, within thirty (30) days from the date of service of notice as provided for in this Act, appeal to the Superior Court for the State of Washington for Thurston County. The appeal shall be perfected by serving a copy of the notice of appeal upon the Supervisor and by filing it, together with proof of service, with the Clerk of the Superior Court of Thurston County. Whereupon the Supervisor shall, within fifteen (15) days after filing of such notice of appeal, make and certify a transcript of the evidence and of all the records and papers on file in his office relating to the order appealed from, and the Supervisor shall forthwith file the same in the office of the Clerk of said Superior Court. The reasonable costs of preparing such transcript shall be assessed by the Court as part of the costs. *A trial shall be had in said Superior Court de novo.* The applicant or licensee, as the case may be, shall be deemed the plaintiff and the State of Washington the defendant. Each party shall be entitled to subpoena witnesses and produce evidence to sustain or reverse the findings and order or demand of the Supervisor. During the pendency of any appeal from the order of revocation or suspension of a license, the order of revocation theretofore entered by the Supervisor shall be stayed and any other order or demand appealed from may be stayed in the discretion of the Court. Either party may appeal from the judgment of said Superior Court to the Supreme Court of the State of Washington as in other civil actions." Laws of 1941, chapter 208, § 23, p. 622; Rem. Supp. 1941, § 8371-23. (Italics ours.)

At the trial, each side presented its evidence to the superior court. It was appellant's position that by a trial *de novo* was meant a trial after which, without regard to the supervisor's order, the superior court could decide whether or not one or both of the licenses sought should be issued. On the other hand, respondent contended that the superior court's inquiry was limited to whether or not the supervisor

had abused his discretion and had acted arbitrarily or capriciously. The trial court at the outset took appellant's view as to the extent and character of the inquiry contemplated by the statute, and admitted evidence on that theory. After the trial was concluded, the trial court in its memorandum decision reversed its first ruling and held that it had been wrong as to the permissible extent and scope of the inquiry and announced that it would consider the evidence only to the extent of determining whether or not the supervisor had acted arbitrarily or capriciously.

The extent of the review contemplated by the italicized portion of this section constitutes the crux of this controversy.

█ The trial court correctly interpreted the phrase "trial *de novo*" as used in the above-quoted section of the statute when it said that the phrase

". . . means a new and independent trial on the law and facts from which the Superior Court shall determine whether or not in this case the license should be granted in view of all the facts and circumstances as disclosed by the evidence and the law applicable to the case."

It was also correct in its ultimate conclusion that the scope of its inquiry under the statute was limited to determining whether or not the supervisor had acted arbitrarily, capriciously, or contrary to law.

These two rulings of the trial court are not inconsistent with each other because the superior court's original construction of the appeal section of the statute, based upon what seems to us the true legislative intent, would render the italicized sentence of Rem. Supp. 1941, § 8371-23, unconstitutional.

The appeal there provided for goes beyond anything provided by way of court review in any of the drafts of the uniform small loan act, as set forth in Hubachek, "Annotations on Small Loan Laws." The legislature in enacting this statute expressed dissatisfaction with what it may have considered to be prior judicial abdication in reviewing the orders of administrative boards and commissions, which

have been uniformly upheld in the absence of a showing that they were arbitrary, capricious, or contrary to law.

We are convinced that the legislature, whether or not it was dissatisfied with the application of the arbitrary or capricious test, with its minimum of judicial review to determine the validity of administrative action, has attempted to place in the superior court for Thurston county powers with which it cannot constitutionally be invested.

■ It seems unnecessary to labor the fundamental doctrine of the constitutional division of powers and the reasons therefor. In this state, the legislative power is "vested in the legislature, consisting of a senate and house of representatives," but with the powers of initiative and referendum reserved to the people (Washington constitution, Art. II, § 1, as amended in 1912 by the seventh amendment); the judicial power of the state is "vested in the supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide" (Art. IV, § 1); and the executive department consists of the governor and other officers named in Art. III, § 1 of the constitution, with the "supreme executive power" vested in the governor (Art. III, § 2).

We recognize that definite and analytical lines marking the separation of powers have not been and cannot be drawn. There is necessarily some mingling and overlapping of powers between the three separate departments of our government. *People ex rel. Rusch v. White,* 334 Ill. 465, 166 N. E. 100, 64 A. L. R. 1006 (1929); *State v. Huber,* 129 W. Va. 198, 40 S. E. (2d) 11, 168 A. L. R. 808 (1946). The separation of governmental powers

". . . is not a doctrinaire concept to be made use of with pedantic rigor. There must be sensible approximation, there must be elasticity of adjustment, in response to the practical necessities of government, which cannot foresee today the developments of tomorrow in their nearly infinite variety." Mr. Justice Cardozo in his dissenting opinion in *Panama Refining Co. v. Ryan,* 293 U. S. 388, 79 L. Ed. 446, 55 S. Ct. 241.

It is the fusion of the different types of governmental power to deal with specific problems which has resulted in the de-

velopment of the administrative process. Schwartz, American Administrative Law 18.

■ However, we are not here concerned with a twilight-zone situation. The licensing and regulation of small loan companies (which are permitted to make loans at rates which had been theretofore unlawful and which are still unlawful when made by anyone except such a licensee) is an exercise of the police power and essentially a legislative and administrative function. *Cavanaugh v. People,* 61 Colo. 292, 157 Pac. 200 (1916), cited and approved in *Kelleher v. Minshull,* 11 Wn. (2d) 380, 119 P. (2d) 302 (1941); *People v. Stokes,* 281 Ill. 159, 118 N. E. 87 (1917); *State ex rel. Downing v. Powers,* 125 Ohio St. 108, 180 N. E. 647 (1932); *People v. Blumenthal,* 157 N. Y. Misc. 943, 284 N. Y. S. 873 (1936); *State v. Huber, supra.*

It is clear that no "elasticity of adjustment" can make the determination relative to the issuance of a license to operate a small loan business essentially or primarily a judicial power. If the statute had provided that applications for such licenses should be made to the superior court for Thurston county in the first instance, and had thereby charged that court with the responsibility of determining whether or not such licenses should issue, it would be agreed by everyone that the statute had imposed a nonjudicial power upon the court and that the portion of the statute so providing was unconstitutional. The addition of another step (original application to the supervisor of banking) does not place that determination any more within the scope of judicial power if, when the matter comes to the court, it is to be disposed of in the same manner as though it had originated there and without regard to the action of the supervisor from which the appeal is taken.

■ We are constrained to hold that the portion of Rem. Supp. 1941, § 8371-23, which purports to vest in the superior court for Thurston county the right to reverse on a trial *de novo* a decision of the supervisor with reference to the granting of such a license and, in effect, to substitute its judgment for that of the supervisor as to whether or not a license should issue, is unconstitutional as an attempt to

vest a nonjudicial power in a constitutionally created court. We must reject this expansion of the court's power as firmly as we would resist a reduction of its rightful authority. *Hunstiger v. Kilian,* 130 Minn. 474, 153 N. W. 869 (1915); *Peterson v. Livestock Comm.,* 120 Mont. 140, 181 P. (2d) 152 (1947). See, also, *Silven v. Board of Com'rs of Osage County,* 76 Kan. 687, 92 Pac. 604 (1907); *Danielley v. City of Princeton,* 113 W. Va. 252, 167 S. E. 620 (1933).

There is language in *Morgan v. Department of Social Security,* 14 Wn. (2d) 156, 127 P. (2d) 686 (1942), from which it can be argued—and appellant does so argue—that we there upheld the equally broad appeal provision contained in initiative measure No. 141 (Laws of 1941, chapter 1, p. 3, particularly § 9; Rem. Supp. 1941, § 9998-34 *et seq.,* particularly § 9998-42), saying that it was not unconstitutional as purporting to invest the court with executive powers. Actually, we held that the department of social security had not acted illegally, arbitrarily or capriciously in determining the amounts the appellants were to receive as senior citizens.

We recognize that there is a wealth of authority to support respondent's position that where the only review of an administrative order that is constitutionally possible is on the question of whether the administrative body or officer acted arbitrarily, capriciously, or in violation of law, it will be held that a provision for a trial *de novo* means only that the appellate or reviewing court will be limited to a consideration of that particular question on the trial *de novo.* The basis for such holdings is the rule that, when a statute is subject to two possible constructions, one of which will render it constitutional and the other unconstitutional, the legislature will be presumed to have intended a meaning consistent with the constitutionality of its enactment. *Casco Co. v. Public Utility Dist. No. 1,* 37 Wn. (2d) 777, 226 P. (2d) 235 (1951); *Peterson v. Livestock Comm., supra.*

That rule should not be applied to the sentence which we have italicized in Rem. Supp. 1941, § 8371-23, for the reason that the presumption that the legislature intended thereby only a review to determine whether the supervisor's ruling

was arbitrary or capricious would be a demonstrably fictitious presumption. By the 1941 act the legislature definitely and drastically changed the appeal provision from that contained in its prior enactment on the same subject in 1937, which provided that the action of the director of licenses was to be "final and conclusive, except for fraud or caprice." See Laws of 1937, chapter 213, § 3, p. 1037. We cannot in good conscience indulge a presumption that the legislature intended a standard of review which it had deliberately discarded.

■ This holding does not mean that the entire act is unconstitutional, or even that all of § 23 (Rem. Supp. 1941, § 8371-23) is unconstitutional. Without the sentence which we find expresses legislative intent to invest the superior court for Thurston county with a nonjudicial power, there is still a provision for an appeal from an order of the supervisor by reason of the severability clause (Rem. Supp. 1941, § 8371-26) which reads as follows:

"If any clause, sentence, section, provision, or part of this Act shall be adjudged to be unconstitutional or invalid for any reason by any court of competent jurisdiction, such judgment shall not impair, affect, or invalidate the remainder of this Act, which shall remain in full force and effect thereafter." Laws of 1941, chapter 208, § 26.

But even if the entire appeal procedure were rendered abortive by the striking of the language heretofore referred to, the supervisor's action would still be subject to judicial review as to whether he had acted arbitrarily, capriciously, or contrary to law.

*Althaus v. State*, 99 Neb. 465, 156 N. W. 1038; *People v. Stokes, supra.*

Our ruling upon the constitutionality of the portion of § 23, above discussed, does not require that this case be remanded to the trial court for further proceedings. Appellant was afforded full opportunity by the trial court to introduce all the evidence it desired to offer under its broad theory of a trial *de novo* for the purpose of determining whether the licenses should be granted. It offered thirty exhibits, all of which were admitted. The testimony com

prises over four hundred pages and covers a wide range. Appellant was permitted to introduce the testimony of all the witnesses whom it desired to present under its view as to the court's jurisdiction.

Concerning the evidence, the trial court commented in its memorandum opinion as follows:

"Applying the same rule [*In re Metropolitan Building Co.,* 144 Wash. 469, 258 Pac. 473] to the case at bar the Court will consider the evidence only to the extent of determining whether or not the Supervisor acted arbitrarily or capriciously. I now hold that to be the extent of the court's inquiry.

"The evidence was largely that of expert witnesses and documents consisting of statistical data compiled by experts and falls within three classifications. (1) Evidence as to the financial ability, character and general fitness of the plaintiff. (2) Evidence comparing conditions of the small loan business in other states, and (3) evidence of business, financial and traffic conditions in and about Seattle and Vancouver.

"It must be conceded that plaintiff meets all the requirements as to financial ability and character and fitness. The record of achievement of plaintiff in other states as disclosed in plaintiff's exhibits D, G, H and J, among others and evidence tending to show that measured by population and or retail sales per licensee in other communities, Seattle is under licensed does not in my judgment have much weight upon the question of the necessity of an additional license. We are concerned here with conditions in the state of Washington and particularly in the localities of Seattle and Vancouver.

"A careful study of the evidence applying to both cases and the briefs and the authorities cited convinces me that the findings and order of the Supervisor are fully sustained by the evidence. That his acts are not arbitrary or capricious but are a proper exercise of the discretion granted to him by the statute and the same will be affirmed and the appeals dismissed."

Appellant complains that the trial court in this memorandum decision reversed its previous ruling and held that the question for decision was whether or not the supervisor had acted arbitrarily or capriciously. However, there is nothing in the record to indicate that appellant could have presented

any different or additional evidence if the court had so held at the beginning of the trial. Appellant might have then been restricted to presenting *less* evidence, but it seems to us that the evidence admitted under the broad theory of a trial *de novo* must have contained all the facts pertinent to the narrower field of inquiry finally fixed by the trial court.

On the merits, we think that the judgment of the trial court was correct since it is based on findings of fact which are fully supported by the evidence.

We cannot agree with appellant's argument that the supervisor's denial of the application for a license in Vancouver based upon the primary finding that

"The granting of the license applied for is not necessary to permit adequate service to borrowers and might create a competitive situation among licensees that would encourage the adoption of unwholesome business practices that might be detrimental to the best interests and welfare of borrowers",
was made without application of the guiding standards prescribed by § 4 of the act. Neither can the supervisor's decision denying the application for an additional license in Seattle be properly held to have been made without regard to such standards.

Section 4 (Rem. Supp. 1941, § 8371-4) reads in part as follows:

"Upon the filing of such application and the payment of such fees and the approval of such bond the Supervisor shall investigate the facts and if he shall find that [among other things] . . . . allowing such applicant to engage in business, will promote the convenience and advantage of the community in which the business of the applicant is to be conducted, and that the applicant has available for the operation of such business at the specified location liquid assets of at least ten thousand dollars ($10,000), (the foregoing facts being conditions precedent to the issuance of a license under this Act), he shall thereupon issue and deliver a license to the applicant to make loans in accordance with the provisions of this Act at the location specified in the said application . . . ."

Appellant contends that the supervisor in denying these applications gave too great consideration to the factor of

the ability of existing loaning agencies to handle the small loan business and did not sufficiently consider the reasonably probable effect of the granting of these applications upon the "convenience and advantage" of the respective communities.

When the applications for licenses were made, it was the duty of the supervisor under § 4 of the act to "investigate the facts," and, among other things, find and determine whether the granting of the applications would promote the convenience and advantage of the communities in which the business of the applicant was to be conducted. One of the important factors to be considered by the supervisor was whether the granting of a license to enter a competitive area would have a tendency to bring about excessive solicitation, overlending and other objectionable practices, either on the part of the applicant or those already engaged in the small loan business, because of the increased competition.

Experience has shown that the small loan business has to be strictly regulated in order to protect the borrower from dishonest and overreaching practices. Experience has further shown that increased competition does not necessarily result in better service to borrowers nor promote the convenience and advantage of the community. In many cases the granting of additional licenses has had a detrimental effect upon the business and has obstructed the attainment of the beneficent purpose of the act. See 8 Law and Contemporary Problems, pp. 1-204.

F. B. Hubachek, in his treatise entitled "Annotations on Small Loan Laws" (1938), points out that the sole purpose of giving the supervisor fact-finding powers was to eradicate the evils which had arisen in the business as a result of unrestrained competition. At page 53 the author says:

"Under acts patterned after the first four drafts [of the uniform small loan law] any applicant could demand and obtain a license to engage in business upon paying a fee, filing a bond, and complying with ministerial requirements. It was originally believed that competition and the free flow of capital would produce the best results, particularly in this field where ill-advised restraints had already played havoc. Under this system a large small loan business came

into existence. While the supply of money to be lent was large it was not distributed in close accordance with the legitimate demand. In some localities the supply exceeded the demand for the type of credit which was contemplated by the act. Licenses were issued to do business in localities where the natural demand was insufficient to sustain a properly conducted lending business. In other places the legitimate demand was not supplied. While the maximum rate of charge permitted was primarily responsible for the distribution of capital between states, it became apparent that competition and natural forces alone would not bring about a distribution of capital in which the supply closely approximated the demand, nor would they produce the best results in respects which depended on the character of the licensees.

"Where competition was too intense events demonstrated that the public interest was not well served. 'There is a tendency for excessive competition to increase costs of lending, and consequently to restrain competitive rate reductions.' There was evidence that some licensees were not operating efficiently or were inadequately financed, either condition obstructing attainment of the objectives of the law. Stock promoters, without practical experience or realization of the commercial importance of fair dealings with borrowers, entered the business to its detriment.

"*To meet these conditions the recommended system of licensing was changed in 1932. The Commissioner was given fact finding powers the exercise of which permitted wide discretion.* The standards established applied both to the qualifications of the applicant and to the conditions in the community where the business was to be conducted. The powers of and grounds for revocation (Section 9) maintain in force, as conditions subsequent, the standards which Section 4 establishes as conditions precedent to the granting of a license." (Italics ours.)

While the supervisor's findings in these cases may not be as artfully worded as they might be, we think that it is evident from the language used that the supervisor found from his investigation of the facts that additional competition in the two areas would not be promotive of the convenience and advantage of the communities. We cannot agree with appellant's argument that the supervisor's findings were concerned only with the ability of existing licensees to

serve the present needs of borrowers and that he failed to give consideration to the probable effect of granting these applications upon the "convenience and advantage" of the respective communities.

The supervisor appears to have been of the opinion that the granting of these applications would increase small loan facilities in these communities to a point where the public convenience and advantage would suffer because of too much competition. Even if the court should disagree with the supervisor's findings, still the court may not substitute its judgment for that of the supervisor upon this question. From the evidence in this case we cannot find that he acted arbitrarily or capriciously in arriving at the findings upon which he based the denial of these applications.

Our decision in *Kelleher v. Minshull*, 11 Wn. (2d) 380, 119 P. (2d) 302, makes it plain that one of the objects of the legislature in enacting the small loan act was to make certain that the needs of the community "were not outrun by the number of such establishments at the risk of defeating the beneficent purposes of the act." Too many such establishments may be as detrimental to the public convenience and advantage as too few.

The judgment of the trial court in each case must be, and hereby is, affirmed.

SCHWELLENBACH, C. J., GRADY, FINLEY, and WEAVER, JJ., concur.

OLSON, J. (concurring in the result)—Because of my view that no portion of the act is unconstitutional I concur in the result expressed by Judge Donworth.

FINLEY, J. (concurring specially)—The historical background of the small loans business and the legislative efforts of the several states to regulate it, in my judgment, constitute unshakable proof of the accuracy of the reasoning and the soundness of the results indicated in the opinion written by Judge Donworth. See 8 Law and Contemporary Problems 1-204. The dissenting opinion of Mr. Justice Brandeis in *New State Ice Co. v. Liebmann*, 285 U. S. 262, 280, 76

L. Ed. 747, 52 S. Ct. 371, respecting the problem of licensed monopoly versus unrestricted free competition in certain fields of business, is refreshing, enlightening and pertinent today, just as it was when written several years ago. As to the use of licensing techniques, and the validity of the concept that too much competition can be dangerous in the small loans business, I wish to emphasize particularly the language of Justice Brandeis in his dissent in the *Liebmann* case (at p. 304) as follows:

". . . while, ordinarily, free competition in the common callings has been encouraged, the public welfare may at other times demand that monopolies be created. Upon this principle is based our whole modern practice of public utility regulation. It is no objection to the validity of the statute here assailed that it fosters monopoly. That, indeed, is its design. The certificate of public convenience . . . is a device—a recent social-economic invention—through which the monopoly is kept under effective control by vesting in a commission the power to terminate it whenever that course is required in the public interest. To grant any monopoly to any person as a favor is forbidden even if terminable. But where, as here, there is reasonable ground for the legislative conclusion that in order to secure a necessary service at reasonable rates, it may be necessary to curtail the right to enter the calling, it is, in my opinion, consistent with the due process clause to do so, whatever the nature of the business. The existence of such power in the legislature seems indispensable in our ever-changing society."

I concur wholeheartedly in the views expressed and the results reached in the majority opinion, but feel compelled to register the personal observations briefly outlined above regarding this matter.

HAMLEY, J. (dissenting)—I agree with the views expressed by the majority on the constitutional question. In my opinion, however, the findings entered by the supervisor in denying these applications demonstrate that he did not apply the legislative standards provided for his guidance.

With respect to the Vancouver application, the supervisor's findings indicate the present number of loaning agencies in that city, including three licensed loan offices; express

the view that these loaning agencies have sufficient funds and adequate facilities to serve the present requirements of small loan borrowers; call attention to a population setback and decline in bank deposits; refer to competition from Portland, Oregon; and point out that the aggregate volume of loans is relatively small. Apparently on the basis of these detailed findings, there is then a primary finding that:

"The granting of the license applied for is not necessary to permit adequate service to borrowers and *might* create a competitive situation among licensees that would encourage the adoption of unwholesome business practices that *might* be detrimental to the best interests and welfare of borrowers." (Emphasis supplied.)

The conclusion is then stated that the granting of the additional license applied for at this time would not promote the convenience and advantage of the community.

It will be observed that all of these findings bear upon the ability of present loaning agencies to handle the business and the likelihood that there is not enough business to support another such agency. It is plain from the findings that the granting of the application would be detrimental to existing loaning agencies. But there is no finding that this would result in excessive solicitation, overlending, or other objectionable practices which the act was designed to prevent. There is not even a clear-cut finding of the ultimate fact that granting the application would be detrimental to the borrowing community.

It is true that the supervisor found that the granting of the license "might" create a competitive situation among licensees that would encourage the adoption of "unwholesome" business practices, and that the competitive situation which "might" thus develop "might" be detrimental to the best interests and welfare of borrowers. This pyramiding of possibilities to arrive at a result deemed undesirable does not appeal to me as a finding either for or against convenience and advantage of the borrowing community.

The record indicates that there was considerable evidence introduced at the trial tending to show that appellant, if granted a license, would offer loans at interest rates below

those now available, and that the competition which it would afford would be of advantage to borrowers. These factors were apparently not taken into consideration in the supervisor's findings and conclusion. There is a great deal of evidence tending to show that, measured by population or retail sales, Vancouver is greatly "underlicensed" when compared to the national average. The supervisor's findings indicate that this factor was not considered.

About the same situation exists with respect to the Seattle application, except that appellant now operates a licensed loan office about one block from the location applied for. The primary finding, quoted below, substitutes the word "may" for "might" and adds a consideration, shown in italics, which appears wholly foreign to the question of the convenience and advantage of the borrowing public:

"The granting of the license applied for is not necessary to permit adequate service to borrowers and will unnecessarily create a competitive situation among existing licensees *in applying for additional licenses in Seattle*, and may tend to encourage the adoption of unwholesome business practices by licensees that may be detrimental to the best interests and the welfare of borrowers."

The legislature has not attempted to define the phrase "public convenience and advantage." The reason is obvious, since it would be impossible to construct a definition which would comprehend every variety and set of circumstances surrounding each particular case. It is impracticable, for the same reason, for the courts to state a precise and helpful definition. *Bank of Italy v. Johnson,* 200 Cal. 1, 251 Pac. 784.

It seems clear, however, that the term "advantage" is broader than the term "necessity," and implies improvement or betterment to a community, rather than imperative need. Even the term "need," when used in statutes of this general character, is not to be understood as "absolute need" or "economic need," but rather as "substantial or obvious need," justifying the issuance of a license or charter. *Moran v. Nelson,* 322 Mich. 230, 33 N. W. (2d) 772. Some further indication of the scope of the term "public convenience and advantage," as used in the small loan act, is to be gained from

our decision in *Kelleher v. Minshull,* 11 Wn. (2d) 380, 119 P. (2d) 302, where we said:

"Thus, the legislature sought not only to guarantee that the small loan business would be conducted by men of the ability, character, and financial standing necessary for the protection of those who may be compelled by reason of some serious emergency to borrow small sums of money, but also to make sure that the needs of the community in that respect were not outrun by the number of such establishments, at the risk of defeating the beneficent purposes of the act. The legislative desideratum was not the mere restriction in number of licensees, but rather the accomplishment of the well known objectives for which the act was passed." (p. 397)

The supervisor is not required to make a conclusive finding as to the actual and inescapable effect which the granting of a license will have upon the convenience and advantage of the community. He is, however, required to find what the reasonably probable effect of the granting of such license will be upon such convenience and advantage. This determination is to be made not only in the light of the relative advantages and disadvantages of having another competitor in the field, and of the factors favorable and unfavorable to the particular applicant, but also in recognition of the administrative powers vested in the supervisor whereby the business methods and practices of licensees may be controlled and regulated.

It should be noted, in this connection, that all operating licensees are subject to constant regulation and surveillance by the supervisor with respect to advertising, rates charged, representations made to borrowers, type of contract and security, methods of collection, and other aspects of their business. This control over licensees is made effective through departmental rules and regulations, submission of annual reports, examination of books and records, and the power to suspend and revoke licenses. Thus it is a mistake to consider that the evils of unrestrained competition can be curbed solely through the denial of license applications.

I am of the view that, in giving almost exclusive consideration to the factor of the ability of existing loaning agen-

cies to handle the business, and in failing to give any consideration to other factors bearing upon convenience and advantage, including those noted above, the supervisor did not apply the guiding standards as prescribed by statute. Under this view the indicated procedure would be to reverse the judgments with directions to the superior court to remand the cases to the supervisor so that he can perform his statutory duties as explained in the opinion. Had the defect which I find in the supervisor's action been due to arbitrary or capricious conduct, it would not be necessary to remand the case to the supervisor, as the superior court could decree the issuance of the licenses.

HILL, J., concurs with HAMLEY, J.

MALLERY, J. (dissenting)—The appellant is admittedly qualified for a license. It is denied upon the ground that too many licenses are bad. The act in question does not provide for certificates of convenience and necessity, as it would have done if the policy adopted by the legislature was to prevent competition. Deliberate monopoly through licensing ought not to be established by judicial legislation.

I dissent.