Robert Dale COX, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13368.

Court of Criminal Appeals of Oklahoma.

July 8, 1964.

Rehearing Denied Sept. 23, 1964.

Second Petition for Rehearing Denied Nov. 10, 1964.

Gene T. Ritter, Ardmore, Person E. Woodall, Norman, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Robert Dale Cox, hereinafter referred to as defendant was charged by information in the District Court of Cleveland County with Manslaughter First Degree. He was tried before a jury, found guilty, and sentenced to serve Four Years in the Oklahoma State Penitentiary. His appeal was timely filed in this Court relying upon two assignments of error for reversal.

It was charged in the indictment that defendant, while engaged in the commission of a misdemeanor,, to wit: Driving While Under the Influence of Alcohol, did wrongfully become involved in a collision with another car resulting in the death of an infant child who was an occupant of the vehicle struck by defendant.

The testimony produced by the State was to the effect that defendant was intoxicated when the collision occurred.

Defendant contended that he attended a football game at Norman, then went to some friends house about 4:30 P.M., where he had dinner and one drink of scotch. He left there about 9:30, and went to a tavern and had one bottle of beer. Shortly after leaving the tavern, the wreck occurred. Defendant was taken from the scene of the wreck by ambulance to the Norman Municipal Hospital. While at the hospital, he was asked by officers if he would agree to a drunkometer test and later a blood test. Defendant gave his consent and both tests were given. The results were unfavorable to defendant's case.

He was charged with Manslaughter, and before trial, defendant filed a Motion to Suppress the results of the two tests on the grounds he was suffering from a concussion at the time the tests were given, and therefore unable to give his consent. And further, that defendant was not under arrest at the time the tests were given. Defendant's only contention of error is to the effect that the trial judge erred in overruling his Motion to Suppress evidence as to the results of the two tests.

Though defendant contends the statements were inadmissible for the reason consent was not given, he fails to set forth the rationale upon which he bases his reasoning. He does not state whether the evidence of the "test results" constitute a violation of due process, or compelled him to produce evidence against himself contrary to the Bill of Rights, or come under the category of evidence obtained by illegal search and seizure.

He intimates he is proceeding under the theory that the evidence was the fruits of an illegal search and seizure as he argues that defendant was not under arrest at the time. A dissertation upon the subject wherein they discuss all theories—due process, self-incrimination, and illegal search and seizure—is to be found in the annotation to Roachin v. California, 25 A.L.R. 2nd Series beginning at page 1407. They list many cases from other jurisdictions dealing with the question of evidence taken without consent of defendant and which category of rationale is claimed to assert error.

This Court is of the opinion the results of a test such as blood tests, drunkometer, etc. taken involuntarily is inadmissible for the reason it constitutes a violation of the Bill of Rights of this State, Art. 2, § 21, which says, "No person shall be compelled to give evidence which will tend to incriminate him * * *". We believe this section of the Bill of Rights is broad enough to encompass more than just oral testimony. We quote from 16 Corpus Juris, page 566:

"The constitutions of the United States and of most of the states provide in somewhat varying language that no person accused of crime shall be compelled to be a witness, or to give evidence, against himself, and these provisions render inadmissible all evidence incriminating accused and obtained from him by compulsion. The prototype of the guaranty is found in the maxim of the common law, Nemo tenetur seipsum accusare, which was brought to America by our ancestors as a part of their birthright; and the privilege against self-incrimination has been

uniformly construed by the courts as giving the citizen protection as broad as that afforded by the common law principle from which it is derived, both the federal and state constitutions being liberally construed to prevent compulsory self-incrimination. Compulsion is the keynote of the prohibition; and to render evidence inadmissable on the ground that defendant was compelled to produce it against himself, it must appear that such compulsion was used as to rob him of volition in the matter." See also, 22 A C.J.S. Criminal Law § 649, p. 539.

The following is taken from 28 Ruling Case Law, Vol. 28, page 434, Sec. 20:

"The rights intended to be protected by the constitutional provision that no man accused of crime shall be compelled to be a witness against himself are so sacred, and the pressure toward their relaxation so great when the suspicion of guilt is strong and the evidence obscure, that it is the duty of courts liberally to construe the prohibition in favor of personal rights, and to refuse to permit any steps tending toward their invasion. Hence, there is the well established doctrine that the constitutional inhibition is directed not merely to the giving of oral testimony but embraces as well the furnishing of evidence by other means than by word of mouth, the divulging, in short, of any fact which the accused has a right to hold secret."

This Court is in accord with the above language and as related in Apodaca v. State, 146 Tex.Cr.R. 593, (Tex.) 146 S.W.2d 381. Therefore, we find ourselves confronted with the task of determining whether or not the law as above stated is applicable in the case at bar.

Defendant presented only two witnesses in support of his motion to suppress. Dr. Robert Patskowsky, a duly licensed and practicing Osteopath Physician from Ardmore, testified he examined the defendant on Tuesday after the collision on Saturday. Said examination took place in the doctor's office located in the city of Ardmore, Oklahoma. He also took a history of the case and testified as to his finding in the following manner:

"Defendant possessed a super orbital contusion and an infra orbital contusion of the right side, primarily of the infra orbital area with a slight laceration of abrasion of that area also. Upon opthalmic examination of the patient I did not find any blood in the interior chamber of the eyes but his lack of convergence struck me as a positive sign of the condition or diagnosis which I will give you later. He also had a contusion of the bridge of the nose, and he had dried blood in the nares and then going to the chest to the right pectoral area, he has a contusion I'd say of the size of a half dollar. His right hand, his thumb primarily, was swollen and quite tender and his left knee was swollen and motion of the knee was quite painful. On my neurology check of the patient which again would go back to the lack of convergence, he had very poor convergence. One sign which I felt was positive was Romberg's which was positive, otherwise his neurological work was, I'd say negative. He did seem, however, mentally, as far as being alert, he seemed somewhat confused, yet, not that he couldn't answer directly, his speech was somewhat slurred yet, his presenting complaint was, chief complaint of the patient, going to the history of the patient, was a severe frontal headache with nausea. The patient never did vomit while in my custody but he was continuously nauseated, even the raising of him in bed would cause him to be nauseated and increase his headache. His blood pressure was elevated upon admission, however that did fall near normal up to the second day in the hospital. The patient was not relieved by normal medication for headache such as a caffeine product or such as Darvon's Compound 65, sometimes it takes

a stronger medication. The patient was dismissed possibly three days later from the hospital to be examined by another doctor for this condition. He stated a specialist, perhaps, should see him."

This question was asked of the Doctor:

"Now upon your examination of the defendant, what you found, state in your judgment, what was his state of mind on the date following the accident, that evening, up until midnight?"

There were several objections by the County Attorney and they were sustained by the Court.

The Doctor further stated: (CM 277) "From the physical findings I feel this patient suffered a cerebral concussion, enough to cause the patient a period of loss of consciousness with a loss of memory or amnesia due to a blow on the head."

At CM 278 this question was asked:

"Well, I will ask it this way, what would have been the condition of his judgment following the accident in your opinion." Answer: "The patient with a concussion with the definition or the physical extent, injury, physical signs and symptoms of a concussion will leave a patient, like I have stated, in a period of amnesia or period of loss of consciousness which can be for a period of undetermined time, determining the extent of the injury. This patient, I feel, did have enough physical signs, three days later, in which I feel there was a concussion which most likely that this patient was not coherent or rational following the accident."

The Doctor was asked, by the Court: "Do you have any factual information about him?"

Answer: "I'm going from physical signs and symptoms."

There was an objection by the county attorney and the answer was stricken by the court.

The Doctor was further asked: "You are basing your judgment on what?"

Answer: "Physical examination from what I saw three days later."

This question was asked: (CM 279) "Now, based upon your knowledge of his condition or appearance, in your judgment did he have, following the accident, would he have had the appearance of perhaps being drunk?"

Which question was objected to by the County Attorney and sustained by the Court.

The following question was asked:

(CM 280)

"Well assuming that he sustained the injury of which you had a history, in an automobile accident and which he was, his head came in contact with some part of the car from which he sustained the injury which you found now what would have been, in your judgment, his appearance following the accident?"

Answer: "This is in a generalized state, right? Most patients I have seen with any type of concussion or any patient I suspect of having a concussion, do present a mind that is foggy, that is not clear, they do not answer correctly as a rule, they don't know where they're at, they don't know their names, their mental state in this way is usually hampered or affected. Now this can be over, I'm not going to say specifically how long this can occur, affecting different people, usually a period of 24 to 48 hours, the patients I have seen, depending on the degree of the injury or concussion, whether the patient will have symptoms of mental disturbances for any length of time, that depends on the accident or the injury."

The following question was asked: "Now based upon the degree of injury that he received, how long would you say that he would have remained in an irrational state following the accident?"

Answer: "Three days later I saw this patient, the patient still presented a

somewhat cloudy mind, a slurring speech. I feel, even after three days the patient was somewhat affected from the concussion. I feel that he wasn't able to give me a complete history at that time so I feel he was still being affected three days later from the injury."

On cross-examination, the Dr. testified in part:

"Q. You say that persons suffering from a concussion will generally, mentally be hampered, does that mean that some are and some aren't?

"A. According to the extent of the injury, I think I stated also the extent of the injury would determine the amount of amnesia or loss of consciousness.

"Q. Cox could have been more than the average or less hampered than the average, is that correct?

"A. That's correct.

"Q. And if he was hampered at all, it could have been during a period, he had different periods, then, is that correct, what time he was hampered a little and the times he was hampered less in his memory and thinking process, is that correct?

"A. Yes and no.

"Q. Then at times he could be perfectly rational?

"A. I wouldn't say that, I wouldn't say he could be perfectly rational.

"Q. He could be adequately rational at times then, is that correct?

"A. I don't think the patient we're discussing now with three day period of when I say him would have been completely rational at any time within those three days.

"Q. How did he drive from Norman to Ardmore?

"A. I don't know.

"Q. How did he get from the hospital to the fraternity house?

"A. I don't know.

"Q. If he had driven a car at any time during that period of time there is a possibility that he was rational, is that correct?

"A. I don't think you have to be rational to drive a car necessarily, sir.

"Q. If cox had called an attorney, that would indicate he had periods of rationality, wouldn't it?

"A. (no answer)

"Q. Would it sir, or would it not?

"BY MR. WOODALL: If it please the court, that is assuming a state of facts not in evidence.

"BY THE COURT: The objection is overruled, this is cross examination of an expert witness.

"Q. Then that would indicate rationality if he had called an attorney, then, is that correct? Would you answer that?

"A. You said a degree of rationality?

"Q. It would indicate rationality, I did not say one hundred percent or one percent.

"A. It would indicate some rationality, I would say a degree of rationality."

Officer Mahan testified, among other things, that he was a police officer in Norman, that he remembered the wreck in question, that he went to the hospital following the accident, where he saw defendant Cox between 9:30 and 10:00 p.m. Testimony as shown by transcript, beginning at page 301 is as follows:

"Q. Did you see the defendant when you first got there?

"A. Yes, sir.

"Q. Did you observe him there?

"A. Observed him from that time until 12 o'clock, stayed right with him.

"Q. What condition was he in?

"A. Well, he appeared to me to be in an intoxicated condition.

"Q. Was he incoherent?

"A. No, if I understood you question right, he wasn't hard to get along with.

"Q. Just describe his actions.

"A. Well he was just like he was drunk, just up and down running to the rest room, we'd have to assist him every time he went to the rest room, he couldn't hardly walk.

"Q. Kind of going one way?

"A. Just kind of like an intoxicated person would act.

"Q. Was he given some tests that night?

"A. At 10:30, approximately 10:30, he was given a drunkometer test.

"Q. Who gave that test?

"A. Trooper McMullen.

"Q. Was he under arrest at that time?

"A. No sir.

"Q. How long did it take to give that test?

"A. Approximately five minutes.

"Q. Now, had the doctor seen him prior to that?

"A. No sir.

"Q. And this test was taken before the doctor saw him?

"A. The drunkometer test, yes sir.

"Q. Why wasn't there any other test given to him at that time?

"A. We was waiting on the examination of the doctor.

"Q. Well, but you did give him the test, was there any particular test you waited until after the doctor came before you gave him the second test?

"A. Yes sir.

"MR. TRIMBLE: Objected to, incompetent, irrelevant and immaterial.

"BY THE COURT: What second test?

"Q. Was he given a test later?

"A. Yes sir.

"Q. How much later?

"A. Well, I'll say, I stated 10:30, in the vicinity of 10:30 on this one and it could have been an hour or an hour and ten minutes later.

"Q. After the first test?

"A. Yes sir.

"Q. Why was it that you didn't give him this second test before the doctor examined him?

"A. I hadn't planned it that-a-way, when the doctor released him, the subject still appeared to me to be in an intoxicated condition.

"Q. Did you plan to give him two tests?

"A. No sir.

"Q. And it was only after the doctor released him that you decided to give him the second test?

"A. Yes, after I placed him under arrest.

"Q. All right now, why was it that you didn't give him that second test, following the first one?

"A. I didn't have the man under arrest, I didn't know whether they were going to keep him in the hospital.

"Q. You didn't have him under arrest when you gave him the first test?

"A. No sir.

"Q. Why didn't you give him the second test at that time?

"A. If the doctor had examined him and the doctor, got the subject's consent for the blood test and got the doctor to draw it, we couldn't draw it, we couldn't do it.

"Q. You didn't get his consent the first time, did you?

"A. Sir?

"Q. You didn't get his consent the first time?

"A. On the balloon test? Yes sir.

"Q. Well I know, but you didn't have him under arrest then.

"BY MR. TRIMBLE: Objected to, incompetent, irrelevant, and immaterial.

"BY THE COURT: Sustained, please ask the witness questions, don't argue with him.

\*　\*　\*　\*　\*　\*

"Q. If I got this straight, you gave him the balloon test about what time?

"A. Approximately 10:30.

"Q. Did you intend to give him a blood test at that time?

"A. No sir. In the first place, there was no doctor, they was all tied up and couldn't have got one if we wanted to.

"Q. What happened then, did the doctor examine him then?

"A. He taken him into the examination room after 11 o'clock and between there and 11:30 or 11:40 he released him and that's when I arrested him and then he gave consent to a blood test and this same doctor examined him gave him the blood test."

During cross-examination of Officer McMahan, a question propounded by the trial court resulted in the following answers:

"BY THE COURT: And then if I am correct, Dr. Fox comes in and examined the defendant, were you present when the defendant told the doctor he might take the blood test?

"A. I was the one that got permission from the defendant and there was a nurse, I don't remember her name and Trooper McMullen was in there when he gave me permission for the blood test.

"BY THE COURT: Then Dr. Fox drew the sample?

"A. Yes sir.

"BY THE COURT: And released him to your custody?

"A. He'd already released him, told me he wasn't going to put him in the hospital, that's when I placed him under arrest and then I got his permission for a blood test and, or otherwise we would have already been away from the hospital.

"BY THE COURT: When did you determine or were you advised that the defendant was to be held if not hospitalized, then to be held in custody?

"A. No, sir, I never was advised of that.

"BY THE COURT: When did you make up your mind that that was going to be the fact?

"A. Well, I had made up my mind when I went to the hospital and saw what condition he was in, if the hospital didn't admit him, that we couldn't turn him loose out on the streets, we was going to have to hold him.

"BY THE COURT: That's all."

RECROSS-EXAMINATION

"BY MR. TRIMBLE:

"Q. Did you intend to place Cox under arrest whenever you first saw him and examined him, saw his condition?

"A. Yes, sir, when I saw him, he couldn't walk, the strong smell of alcohol on his breath."

The above testimony is in substance that which was deemed favorable to the state and defendant as revealed in the respective briefs.

■ This Court has long abided by the rule and it is clearly the law that, on a Motion to Suppress, a question of fact is presented to the trial court for the determination of the court and the Court of Criminal Appeals will not reverse where there is competent evidence in the record reasonably tending to support the trial court's finding. King v. State, Okl.Cr., 357 P.2d 230; Treadway v. State, Okl.Cr., 338 P.2d 360.

■ A careful review of the testimony of defendant's two witnesses is not conclusive to the extent that the trial judge abused his discretion in overruling the Motion to Suppress. Dr. Patskowsky's testimony expressed an opinion, based upon a physical examination three days after the collision occurred, that defendant was suffering from a concussion, which produced a loss of consciousness and loss of memory following the accident. While the defendant's only

other witness, Officer McMahan, testified positively that he received defendant's consent for both tests. He testified in substance that the only abnormality he detected about defendant was that he appeared to be under the influence of alcohol. It is difficult for this Court to consider the testimony of the doctor with that same degree of conclusiveness that is usually attached to expert medical testimony, in view of the fact that he did not see the defendant until *three* days after the accident and we are of the opinion that the trial judge looked upon it with the same degree of skepticism. His testimony was similar in nature to an answer to a hypothetical question, based upon an examination today— "What was his condition three days ago".

The burden was upon the defendant to show on the Motion to Suppress, that he was unable by virtue of his injury to give consent. The proof offered did not meet this requirement as to sustain the motion. A review of the entire record does not indicate a mis-carriage of justice occurred by the overruling of the Motion to Suppress.

The defendant offered objection to the results of the test thruout the trial. However, in the instant case, the proper procedure was followed and a ruling had on the matter as a preliminary question. The voluntary giving of the tests. being raised by the defendant at a hearing on the Motion to Suppress, a question of fact was presented to the trial judge for determination, and though additional testimony was presented during the trial by defendant in support of his contention, it then became a question for the jury. During the course of the trial, the defendant presented the testimony of Dr. Fox, who drew the sample of blood in question. He testified in substance, that defendant, on the night of the accident was a very confused boy. That he did not know whether he was intoxicated or suffering from a concussion. That he took the sample of the defendant who eventually consented. That he doubted if he was capable of giving consent. That he

didn't consider the defendant a victim of a fracture. That they didn't X-ray defendant and may have made a mistake. That it was very difficult to distinguish between a person suffering from a concussion and being drunk. That he couldn't say whether he was drunk or not, only that he was a miserably confused boy. The state presented six witnesses whose testimony tended to prove defendant was under the influence of liquor. Keary Hayes testified that he went to the scene of the accident immediately after it happened and that he smelled liquor on defendant's breath, and when asked by defense counsel relative to a statement made by defendant as to its rationality, witness answered: "to me, it's as rational an answer as you can expert from a man laying there drunk".

Freddy Joe Chapman saw defendant at the scene and helped remove him from the car. His testimony was to the effect that defendant was unconscious at the time he first saw him, and further that he smelled alcohol on his breath. He sat by defendant at the hospital. He testified, in part, as follows:

"A. Answer the question? Well, he didn't say much, and I didn't make any attempt to talk to him anyway, carry on a conversation; but there was an officer standing there. It was outside of the emergency room, and he tried to talk to the officer a few times. He said something to the effect that— he motioned the officer to come over to him, and the officer said, 'Go ahead and talk right here.' He said, 'No, come over here.' 'I want to speak to him'; so the officer walked over to him, and he said, 'When we get out of here, I'd like to have a drink with you', then he stopped, he said, 'No, I didn't mean that', he said, 'I mean I want to talk to you when we get out of here.'

"Q. Did you smell alcohol or alcoholic beverages on Cox's breath?
to him to smell. I could see, I could
"A. Well, sir, I wasn't close enough

tell by the way he walked and the way he talked he appeared to be intoxicated to me."

Officer Gene Wagner testified in part, as follows:

"A.   Okay.   I first observed him standing by his car and he, to me, seemed very staggery, weak on his feet, which my first impression is he was hurt. There were several people around there hurt, which I went over to see about assisting him also, and it appeared to me at the time he was very drunk. He was unable to stand by himself. He had a couple of buddies there helping hold him up at the time I first seen him; and also then when the ambulance arrived to take him away he more or less was belligerant, didn't want to go, tried to pull back; and he had to be led to the ambulance, kept saying he wasn't hurt, and there was a strong smell of alcohol on his breath at this time."

Officer Walter Ketner testified in part:

"A.   On arrival at the hospital he was at that time walking around—or when I walked in the door he was sitting down.   After that he got up and walked around the floor and was very staggery. His speech was very incoherent.   You could hardly understand his talk and he had a very strong smell of alcohol about his person.   He smoked one cigarette right after the other.   He would light one, take about one puff, throw it in the ash tray, and then light another one; but he, to my opinion, was very intoxicated."

Also said defendant informed he and Officer McMahan he had drunk 1 pint of whiskey and 2 cans of beer, and in his opinion, defendant was very drunk.

The record reveals that there was an abundance of testimony as to defendant's intoxication, excluding evidence of the two tests.   This Court said in a case which we deem controlling, Turvey v. State, 95 Okl. Cr. 418, 247 P.2d 304:

"There are other assignments of error which we do not consider meritorious. The court should not admit evidence of defendant's intoxication where such tests were given over objection of accused.   Apodaca v. State, 140 Tex.Cr.R. 593, 146 S.W.2nd 381.   But there was no evidence in this record to show any involuntariness on the part of the accused in the tests that were given, such as walking a line in the police station and placing his finger to his nose. *Furthermore there was abundant evidence outside of the tests to support the state's theory of his intoxication and we would not reverse the case on the ground that the result of these tests was inadmissible as having been forcibly given in violation of the constitutional rights of the accused.*" (Emphasis supplied)

The jury was instructed as to the necessity of the tests being voluntary in order for them to be admissible, and that if they found the tests were taken without defendant's consent or knowledge or under such conditions showing that such tests made of the defendant were not freely, voluntarily, or knowingly made on the part of the defendant.   Then the jury must disregard such tests and results thereof as affording any evidence against the defendant.   (Instruction No. 12)

■   The conflict of testimony given at the trial created a question for the jury after it had been decided as a preliminary matter on Motion to Suppress.   It was submitted to the jury with an instruction very favorable to defendant.   The jury was the weigher of the evidence and judge of each witness' credibility.   They evidently chose to disbelieve defendant's theory of the case.   This was within their province.

It is the opinion of this Court that the trial court did not err in permitting the evidence of the test to reach the jury with proper instructions.

Defendant's second contention of error is that the results of the tests were inadmissible for the reason defendant was not under arrest at the time the tests were made. As heretofore said, this indicates that defendant is making an effort to bring it under the category of illegal search and seizure. We will discuss it no more than to say we subscribe to the rationale that involuntary tests should be excluded for the reason their admission is repugnant to the Bill of Rights, Art. 2, § 21, self-incrimination; and not illegal search and seizure.

This case has given this writer much concern. The defendant is a young man with apparently a good reputation and certainly had no malice in his heart nor intent to take human life. He gambled for high stakes when he drove an automobile upon a public road while under the influence of alcohol. In such cases, death is always lurking. He was tried before a jury of his peers, found guilty, and sentenced to four years in prison. We cannot substitute our opinion for that of the jury. We are to determine whether he had fair and impartial trial, free from error, with all his constitutional rights afforded him. That we have done.

It is therefore the order of this Court that the judgment and sentence of the trial court is hereby affirmed.

JOHNSON, P. J., concurs.

BUSSEY, J., not participating.