[No. 37698.    Department Two.    October 7, 1965.]

THE STATE OF WASHINGTON, *Respondent*, v. JEFFERY CRAIG, *Defendant*, KENNETH L. KONTRATH, *Appellant.**

*Donald C. Dahlgren,* for appellant.

*Charles O. Carroll* and *David W. Soukup,* for respondent.

*Reported in 406 P.2d 599.

KELLY, J.†—A jury found the defendant Kontrath, then 22 years of age, guilty of first degree forgery. He appeals.

Jointly charged with Kontrath was one Jeffery Craig, who, prior to trial pleaded guilty, was sentenced and then called as a witness by Kontrath at his trial on March 2, 1964. Prior to that, and on October 17, 1963, Kontrath and Craig had been arrested on suspicion of forgery. The next day, a detective of the Seattle Police Department handed Kontrath a handwriting exemplar card and asked him to fill it out, which he did. This card (exhibit No. 7) was turned over to the department's handwriting experts who compared it with the writing on a forged check that was cashed at the Olympic Hotel in Seattle on October 17, 1963. The experts testified the writing on the forged check was that of Kontrath, except for the signature.

Inasmuch as the principal, if not the only question raised on this appeal relates to the admissibility of this exhibit No. 7 in evidence, we set out in full the testimony pertaining to its acquisition as given by Detective Poth. After stating his name, occupation and years of service (13) as a detective, the following occurred in open court.

Q [By the prosecutor]: Showing you what has been marked State's Exhibit No. 7 for identification, do you recognize that? A. Yes, I do. Q. What is that, please? A. It is a hand written exemplar card which the defendant gave to me on October 18, 1963. Q. Whose hand writing is that on that card? A. Kenneth Kontrath. Q. The defendant? A. The defendant in this case. Q. Did he write that in your presence? A. Yes, he did. Q. Did he appear to be writing normally when he wrote this card? A. Yes, he did. Q. What did you do with this card? A. I signed my name to it and later on in the day I gave it to Detective Jerry Kelson, Seattle Police Department. Q. Was it subsequently returned to you by Detective Kelson? A. Yes, it was, the same day. Q. What did you do after that with it? A. I put it in my file in Room 510, Seattle Police Department. MR. SOUKUP: I will offer this, your Honor. THE COURT: Any objection?

†Judge Kelly is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

MR. DAHLGREN [defendant's counsel]: May I ask the witness a couple of questions? THE COURT: Yes. BY MR. DAHLGREN: Q. Did the defendant volunteer to submit to this handwriting test? A. I asked him if he would fill the card out and handed him a pen and he did so. Q. Did you explain he had the right to refuse if he so desired? Was there any such explanation preceding the request for the signature? A. No, there was not. There were a few questions asked. I don't remember what they were right now. Q. You didn't explain to him he had the right to refuse? A. I explained to him as he was writing it out what it would be used for. Q. And this was after he started writing on the card, is that right? A. Yes, correct. THE COURT: Anything further? MR. DAHLGREN: No further questions. BY MR. SOUKUP: Q. After you explained this to him, did he continue to write the card? A. That is correct. Q. Did you make any promises or threats of any sort? A. None whatsoever. THE COURT: Any objection? MR. DAHLGREN: I don't know, your Honor. It seems the witness should have had the opportunity to recognize what his rights were and what it would be used for prior to his beginning to place anything on the card. We have the testimony of the detective to the effect he wasn't given this information, what it would be used for until after he had already signed it. It seems the procedure is improper and I would object to its admission on that basis. BY THE COURT: Q. Was there anything involuntary about this man doing this? A. No pressure, no force. He filled it out. As he started writing his name, I explained what it was for. THE COURT: The objection is noted. It will be overruled. State's Exhibit 7 admitted in evidence.

■ There is no further testimony in the record concerning the procurement or admissibility of exhibit No. 7 into evidence. Other than as noted, no request was made of the court to reject it and, even if the quoted portion of counsel's remarks were considered as a motion to suppress, it was not made timely nor in the proper manner. *State v. Gunkel*, 188 Wash. 528, 63 P.2d 376 (1936). See, also, *State v. Lemons*, 53 Wn.2d 138, 331 P.2d 862 (1958); *State v. Robbins*, 37 Wn.2d 431, 224 P.2d 345 (1950); *State v. Miles*, 29 Wn.2d 921, 190 P.2d 740 (1948); *State v. Funk*, 170 Wash.

560, 17 P.2d 11 (1932); *State v. Beaupre,* 149 Wash. 675, 272 Pac. 26 (1928).

No further request was made to the court to withdraw the exhibit or to instruct the jury to disregard it. The defendant took the stand in his own defense, but nowhere throughout his entire testimony was any reference made, much less a complaint, to his having given the exemplar in question or that he did it other than voluntarily. Kontrath admitted during the course of his testimony that he had prepared the entire face of state's exhibit No. 2, the forgery he is charged with committing, but that he did not affix any signature thereto; and that he knew that exhibit No. 2, a check for $45, was to be passed by his erstwhile codefendant Craig, who forged the signature. He admitted that he had a criminal record consisting of joyriding, vagrancy, and a check charge in Spokane, Washington, on which he had been convicted but had been granted a new trial (*State v. Kontrath,* 61 Wn.2d 588, 379 P.2d 359 (1963)), and was on his way back to Spokane for that trial when the crime alleged in this case was committed. He virtually pleaded guilty to the crime charged in the information during his own testimony from the witness stand. When asked by his counsel to explain his position, he stated:

Like I said, I didn't know the crime was that great. At the time I thought it was like drawing money out of the bank, a misdemeanor. I didn't think I could be implicated in any way. I knew it was doing wrong. I think—I didn't think it was serious, filling out the face of the check.

Later on he was asked by his counsel:

Q. Do you have anything else you'd like to tell the jury, Mr. Kontrath? A. No sir, except as far as the law reads, I don't know what constitutes forgery. All I know or thought, I knew by filling out the check, I knew I was doing wrong. I didn't feel I was committing a felonious crime. Insufficient funds is a misdemeanor and could be no more than some days in the county jail.

Under cross-examination, Mr. Soukup, the deputy prosecutor, asked:

Q. . . . You say you were doing wrong, but you thought it was only a misdemeanor. A. Yes, sir. Q.

Would it make a difference if you knew it was a felony and not a misdemeanor? Would you have done it for your friend if you knew it was a felony and not a misdemeanor? A. No, I don't think I'd have done it, no.

Jeffery Craig testified that:

During this time Mr. Kontrath was filling in the date, October 17, payee's name, Olympic Hotel, forty-five dollars. I agreed it seemed to be a logical amount for a hotel. Q. Your testimony is Mr. Kontrath actually filled out a part of the check. Is that correct? A. Yes, he did.

Defendant's counsel stated:

The sole question raised by this appeal is whether or not appellant's rights under the Federal Constitution were violated when a handwriting sample was extracted from him by a member of the Seattle Police Department without first explaining to appellant that such sample would later be used as evidence against him in the trial of his case and that a person in a criminal case cannot be compelled to testify against himself.

The court's answer to the question thus posed and in the light of the essential parts of the record which have been set out above is a definite "No."

Several reasons propel us to our conclusion. First, in view of the damaging admission that defendant made when he testified and the testimony of his own witness Craig, who was his partner in crime, even if the writing exemplar should have been excluded, no prejudicial error occurred because the exemplar card was merely cumulative evidence.

█ In giving the handwriting exemplar to the police detective, the defendant did a voluntary act. He was coerced in no way, either psychologically or otherwise. His subsequent testimony from the witness stand verifies this fact. We are, nevertheless, asked to hold, based upon his own premise that not having been specifically advised that he did not have to do such an act, the fact of his doing it voluntarily cannot be considered. To reach such a conclusion would be to reduce the law to an absurdity. One who voluntarily does a physical act, such as furnishing the exemplar in question, cannot be heard to complain that

his constitutional rights were violated when a witness to the writing testifies to the fact and identifies the writing. "Voluntariness" is still the norm and standard by which such acts should be and are by this court judged. *State v. Darst*, 65 Wn.2d 808, 399 P.2d 618 (1965); *State v. Self*, 59 Wn.2d 62, 366 P.2d 193 (1961).

In *State v. Self, supra,* where a similar contention was made by a defendant who contended that because a murder weapon was the product of a confession which was given in the absence of counsel, it was inadmissible, we held that the test of exclusion is not whether the confession was made in the presence of counsel, but whether or not it was made voluntarily. In the later case of *State v. Darst, supra,* which considered the United States Supreme Court case of *Escobedo v. Illinois*, 378 U. S. 478, 12 L.Ed. 2d 977, 84 Sup. Ct. 1758 (1964), we concluded that failure to advise accused of his right to remain silent or that his statements will be used against him in evidence does not ipso facto invalidate a confession, since the essential test to determine the admissibility of a confession is to ascertain whether it was voluntarily given.

■ It appears that the writing of a signature was assumed to be testimonial in nature and its admission into evidence was asserted to infringe what defendant claims to be his "constitutional right to remain silent." The privilege against self-incrimination applies to testimonial compulsion only. It does not apply to a simple physical act, a bodily action like taking off shoes or rolling up sleeves or writing for identification. These are simply body exhibitions. See 8 Wigmore on Evidence § 2265 (McNaughton Rev. 1961), and Dean Judson F. Falknor in 1953 Annual Survey of American Law 755.

In *People v. Whitaker*, 127 Cal. App. 370, 15 P.2d 883 (1953), in which the fact pattern is strikingly similar to the case at bar, the defendant, after his arrest and while in police custody, executed an exemplar of his writing which was later introduced into evidence and compared with a forgery. On appeal, the defense contended it was error to admit the exemplar into evidence since there was no

showing that defendant was warned that it might be used against him or that it was voluntarily given. The court said that such a showing was necessary only in the case of a confession and writing exemplars were not confessions. See, also, *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923).

Even if we assume the proposition that taking a specimen of hand writing from appellant can be the basis of a valid claim that he was compelled to be a witness against himself, it nonetheless remains true that it is not essential to the admissibility of exhibit No. 7 that the appellant should have been first warned that it might be used against him, provided that the exemplar was voluntarily furnished; and that much affirmatively appears. *Bryant v. United States,* 244 F.2d 411 (5th Cir. 1957).

After all, everyone suspected of crime or charged therewith has the right to voluntarily speak or act, or refrain from doing so, without having sections of the state and federal constitutions recited to him before he can exercise that right. Defendant freely exercised his physical and mental faculties to commit the crime of forgery. He should be accorded the same freedom to demonstrate how he performed the act.

Where such voluntary act tends to link him with the crime of forgery, admittedly committed by him, should we disregard his freedom to speak and to write in order to save him, the wrongdoer, from paying for his crime and forget his victims entirely? If so, we are guilty of coddling the criminal and are, in effect abrogating the laws enacted for the protection of society in its person and property. This we decline to do. Defendant had a fair trial, free from error.

Judgment affirmed.

ROSELLINI, C. J., HILL and WEAVER, JJ., concur.

HAMILTON, J., concurs in the result.