[No. 41141.    En Banc.    April 8, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS LEE MOORE, *Appellant*.

*Jack Steinberg*, for appellant.

*Charles O. Carroll, Prosecuting Attorney*, and *Philip Y. Killien, Deputy*, for respondent.

FINLEY, J.—The constitutionality of the Washington "Im-

plied Consent Law" is here before this court for the first time. The law—adopted by the electorate as Initiative Measure No. 242 on November 5, 1968—[1] requires motorists suspected of driving while intoxicated to submit to a chemical test of blood alcohol content or face revocation of their license to drive.

The appellant stands convicted in the King County Superior Court of driving while intoxicated. We have accepted the direct appeal here because of the fundamental issues requiring ultimate determination by this court. In affirming appellant's conviction, we uphold the constitutionality of the "Implied Consent Law" to the extent its constitutionality is presented in this appeal.

The fact pattern of the case can be summarized as follows: Appellant, after driving his automobile to Tacoma to attend a meeting, discovered the meeting had been canceled. He then spent some time in a Tacoma tavern, where he allegedly consumed two beers. On the return trip to Seattle, appellant was stopped on the freeway by a state patrolman. The officer testified that appellant's vehicle partially crossed over lane dividers into the adjacent lane five or six times. He further testified that the appellant was unsteady on his feet, had a strong odor of intoxicants, spoke in a "slurred, hard to understand and disoriented" manner, and performed two sobriety tests poorly. Appellant contends that his conduct resulted in part from physical and speech disabilities.

Appellant was placed under arrest and taken to the local office of the State Patrol. There, he was advised of his "rights"[2] under the "Implied Consent Law," and was informed that if he refused to take a breathalyzer test his license to operate a motor vehicle would be revoked. Appellant consented to the test. This showed his blood alcohol

---

[1]Codified as RCW 46.20.092, 46.20.308, 46.20.311, 46.20.911 and 46.61.506.

[2]Suspects are given the right to refuse a chemical test and the right to have additional tests performed by any qualified person of their choosing. RCW 46.20.308.

level to be 0.23 per cent. Under the provisions of RCW 46.61.506, an alcohol level of 0.10 per cent, or more, raises a presumption of intoxication.

In seeking reversal of his conviction appellant advances three arguments: (1) The results of the breathalyzer test were inadmissible as evidence because (a) the "Implied Consent Law" is unconstitutional, and (b) the breathalyzer test was improperly administered; (2) even if the results of the breathalyzer test were admissible, they were insufficient to sustain a conviction; and (3) the evidence, exclusive of the results of the breathalyzer test, was insufficient to sustain a conviction.

The intoxicated driver is undoubtedly an increasing public menace of alarming proportions. Why we, as a modern, socially conscious people, have not taken more stringent and more effective measures to reduce the highway death toll is indeed paradoxical, to say the least. The relationship of alcohol to vehicle fatalities was recognized as early as 1904—5 years after the nation's first fatal motor vehicle crash. Reliable research indicates that, presently, intoxication is a factor in at least one half of all motor vehicle fatalities.[3] *See* U. S. Department of Transportation, Alcohol and Highway Safety—A Report to the Congress from the Secretary of Transportation 11-16 (August 1968); National Safety Council, Accident Facts 52 (1969 ed.); Accident Research (W. Haddon, E. Suchman & D. Klein eds. 1964). In an effort to control or reduce the drunk-driver hazard to highway safety, a large majority of states has enacted laws authorizing chemical tests to determine blood alcohol content in drivers suspected of being under the influence of intoxicating liquor. These laws have almost uniformly withstood various constitutional attacks. *See, e.g., People v. Sudduth*, 65 Cal. 2d 543, 421 P.2d 401, 55 Cal. Rptr. 393 (1966); *Anderson v. Macduff*, 208 Misc. 271, 143 N.Y.S.2d 257 (1955); Annot., 88 A.L.R.2d 1064 (1962).

[3]In 1968, 56,400 persons were killed on our nation's highways; 929 persons lost their lives on Washington's highways. National Safety Council, Accident Facts (1970 ed.).

Our statute, which generally parallels language of the Uniform Vehicle Code, does not differ materially from those found in most states. *See Uniform Vehicle Code and Model Traffic Ordinance* § 6-205.1 (rev. 1968); 45 Wash. L. Rev. 656 (1970). RCW 46.20.308 provides in relevant part

> Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of RCW 46.61.506, to a chemical test or tests of his breath or blood for the purpose of determining the alcoholic content of his blood if arrested for any offense where, at the time of the arrest, the arresting officer has reasonable grounds to believe the person had been driving or was in actual physical control of a motor vehicle while under the influence of intoxicating liquor. . . . Unless the person to be tested is unconscious, the chemical test administered shall be of his breath only.[4]

In attacking the constitutionality of the "Implied Consent Law," appellant first contends that the law cannot be sustained as a valid exercise of the state's police power because it will not curb the drunken driver. The appellant's reasoning is that the law is ineffective because most serious traffic accidents are caused by alcoholic drivers who, because they cannot resist their desire for alcohol, will not be deterred by the law. The reasoning, while ingenious, must fail. We have long held, and recently reiterated, that

> In prescribing the police power, all that is constitutionally required of the legislature is that a state of facts can reasonably be conceived to exist which would justify the legislation. If the courts can reasonably conceive of such a state of facts, they must presume that such facts actually did exist and that the statute being tested was passed with reference to them.

---

[4] RCW 46.20.308 further provides that any person who refuses to submit to a chemical test, after being informed that such refusal will result in the revocation or denial of his privilege to drive, shall not be given a test. Such person's license or permit to drive shall be revoked. The driver may request a hearing before the Department of Motor Vehicles, and may appeal any decision there reached to the superior court. Since the appellant in the instant case submitted to the breathalyzer test given, our opinion does not reach any question involving the statute's license revocation provisions.

*State v. Laitinen,* 77 Wn.2d 130, 134, 459 P.2d 789 (1969). We think the legislature could reasonably assume that the public welfare and safety is substantially affected by all intoxicated drivers, and that the requirement of submission to chemical tests would significantly reduce the menace of the drunken driver. That our law will not deter all drunk drivers is lamentable, but this fact does not render it an unconstitutional exercise of the state's police power.

Appellant next contends that the "Implied Consent Law" is unconstitutional because it compels an accused to give evidence against himself in violation of his privilege against self-incrimination. It is not disputed that the federally guaranteed privilege against self-incrimination embodied in the fifth amendment to the United States Constitution extends only to testimonial or communicative evidence. The privilege does not protect an accused from being the source of real or physical evidence against himself. *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). Appellant does not contend otherwise. Rather, he urges that the "Implied Consent Law" violates his privilege against self-incrimination guaranteed by article 1, section 9 of the Washington State Constitution. That provision provides

> No person shall be compelled in any criminal case to give *evidence* against himself, . . .

(Italics ours.) The fifth amendment to the United States Constitution provides

> . . . nor shall [any person] be compelled in any criminal case to be a *witness* against himself, . . .

(Italics ours.)

Appellant presents an articulate argument for the proposition that we are not bound to place the same interpretation on our state constitutional privilege against self-incrimination as has been placed on that contained in the United States Constitution. He reasons that our provision, which is worded in terms of giving *evidence,* should be

interpreted by this court to include physical evidence because our provision is meant to grant a broader protection than that granted by the Fifth Amendment. We are not persuaded, however, that the difference in language between the two constitutional provisions is determinative. While it may be granted that the words "evidence" and "witness" are not synonymous in terms of standard dictionary definition, this court must interpret specific words of the state constitution in consonance with the principles of law which they are used to express. In defining the parameters of the privilege against self-incrimination, the origins of this fundamental civil liberty are instructive:

> The privilege against self-incrimination is of ancient origin and when incorporated in the American constitution was hallowed by the traditions of the unremitting struggle in England against the tyranny of the Crown. The maxim *nemo tenetur seipsum prodere* (no one is bound to accuse himself) arose as a reaction against the ecclesiastical practice of inquisition, where the accused was required *ex officio* to take an oath to answer truly under inquisitorial interrogation.

E. Dumbauld, The Bill of Rights, and What it Means Today 77 (1957).

*Schmerber* recognizes the variance in wording between various state provisions and the federal provision:

> Many state constitutions, including those of most of the original Colonies, phrase the privilege in terms of compelling a person to give "evidence" against himself. But our decision cannot turn on the Fifth Amendment's use of the word "witness." "[A]s the manifest purpose of the constitutional provisions, both of the States and of the United States, is to prohibit the compelling of testimony of a self-incriminating kind from a party or a witness, the liberal construction which must be placed upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guarantees, however differently worded, should have as far as possible the same interpretation . . . ." *Counselman v. Hitchcock*, 142 U. S. 547, 584-585. 8 Wigmore, Evidence § 2252 (McNaughton rev. 1961).

*Schmerber*, 384 U.S. at 761-62 n.6. Where language of our

state constitution is similar to that of the federal constitution, we have held that the language of the state constitutional provision should receive the same definition and interpretation as that which has been given to the federal provision by the United States Supreme Court. *State v. Schoel,* 54 Wn.2d 388, 341 P.2d 481 (1959).

This court has recognized the Schmerber distinction between physical and testimonial evidence on several occasions. *Mercer Island v. Walker,* 76 Wn.2d 607, 458 P.2d 274 (1969); *State v. Duckett,* 73 Wn.2d 692, 440 P.2d 485 (1968); *State v. West,* 70 Wn.2d 751, 424 P.2d 1014 (1967). The Washington constitutional provision against self-incrimination envisions the same guarantee as that provided in the federal constitution. There is no compelling justification for its expansion. The protection of both constitutional provisions extends only to testimonial or communicative evidence. We therefore hold that the "Implied Consent Law" does not compel an accused person to give evidence against himself within the meaning of article 1, section 9 of our state constitution.

■ Appellant's final attack upon the constitutionality of the "Implied Consent Law" centers on that provision which purports impliedly to waive an accused's privilege against self-incrimination. RCW 46.20.308 provides that all drivers upon this state's highways "shall be deemed to have given consent . . . to a chemical test . . . " Appellant argues that the provision cannot be sustained because the waiver of a constitutional right cannot be implied; rather, it must be voluntary. *Garrity v. New Jersey,* 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967). We find no merit in this contention. In the instant case, appellant voluntarily consented to the performance of a breathalyzer test. Even if he had not so consented, or if it can be argued that his consent was given only to avoid the sanction imposed for nonconsent, the result would not be different. The law's constitutionality need not be sustained by reference to its "implied consent" provision. We prefer to base our decision on other grounds, and have done so. Whether an

accused's consent to the chemical test be voluntary or involuntary, the law, with its rights afforded the accused, is constitutionally sustainable as a reasonable exercise of the state's police power, having as its purpose the reduction of traffic carnage occasioned by the inebriated driver. Even if we were to adopt defendant's view that the law could not be sustained on the basis of its "implied consent" rationale, this court will construe a statute, where possible, so as to render it valid. *In re Flynn*, 52 Wn.2d 589, 328 P.2d 150 (1958); *Household Fin. Corp. v. State*, 40 Wn.2d 451, 244 P.2d 260 (1952).

Appellant contends that the results of his breathalyzer test were inadmissible as evidence on the ground that the test was administered in an improper manner. Although certain evidence is in conflict as to whether defendant may have smoked a cigar immediately prior to performing the test, the legal import of this fact, if true, upon the results of the breathalyzer test is not substantiated in the record. Appellant further contends that even if the results of the breathalyzer test were admissible, they were insufficient to sustain a conviction because the test was given 1½ hours after he had been stopped, by which time more alcohol had been absorbed into his blood stream. We find nothing in the record to substantiate either of appellant's claims that the breathalyzer test was not performed in accordance with the requirements prescribed in *State v. Baker*, 56 Wn.2d 846, 355 P.2d 806 (1960).

In view of our holding, it is not necessary to discuss appellant's final contention that evidence exclusive of the results of the breathalyzer test was insufficient to sustain his conviction.

The judgment of the trial court is affirmed.

HAMILTON, C.J., HUNTER, HALE, NEILL, and STAFFORD, JJ., concur.

ROSELLINI, J. (dissenting)—Everyone desires to remove the drunken driver from our highways. Everyone desires to keep the convicted drunken driver from again driving on

our highways until his antisocial drinking has been controlled. The question is: How do we accomplish this while safeguarding the individual's constitutional rights? The "implied consent law" accomplishes neither of these things. Its only purpose is to obtain easier convictions in prosecutions for the crime of driving while under the influence of alcohol.

The implied consent law, by legislative fiat, declares that everyone who operates a motor vehicle upon the highways has given *consent,* if arrested, to submit to a chemical test to ascertain whether the alcoholic content of his body fluid is sufficient to convict him according to a predetermined standard which is set very low. If he refuses, his driver's license is revoked for 6 months, even though subsequently he may be acquitted of the charge of driving while intoxicated.

This provision I find obnoxious and unconstitutional. If this pernicious doctrine is carried to its logical conclusion, a person who is accused of a crime could be punished (say by imprisonment for 1 year) if he refuses to confess.

Law enforcement officers are not without means of fortifying their oral testimony. Under existing statute, the officer has the right to take the accused into physical custody and transport him to the station where corroborative witnesses are available in respect to the issue of intoxication.

Of course, a very effective scientific device is the instant visual and audio television camera with its recording tape. This device avoids the constitutional infirmities of the present law. Not only would such a device prove intoxication, but would be invaluable to record confessions, refute police brutality when alleged and give the true replay of the facts on video tape.[5]

If we could apply known scientific techniques to the DWI problem, we could solve this problem. We have failed to declare all-out war on the drunken driver. Everyone who is acquainted with the problem knows that the antisocial

---

[5]Bremerton police department uses video tape.

drinker is the one who causes most of the accidents and problems on the highway; yet he is not now identified. He need not prove that he has controlled his drinking before he is again licensed; he needs only to be able to afford and secure collision and comprehensive liability insurance. No one convicted of driving while intoxicated should again be licensed to drive unless he can demonstrate that his drinking habits have been conquered to the extent that the probability of his driving while under the influence of intoxicating liquor is remote.

Now to the reasons I would hold unconstitutional the "implied consent law":

I do not agree with the holding of the majority that the breathalyzer test is not within the protection of article 1, section 9, of the Washington State Constitution:

> Rights of Accused Persons. No person shall be compelled in any criminal case to give evidence against himself, . . .

The majority of the court feels constrained to follow the interpretation which has been placed upon the fifth amendment to the United States Constitution by the Supreme Court of the United States in *Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966). That case held that compulsory blood tests for the purpose of determining alcoholic content of an individual's blood do not fall within the ambit of the fifth amendment to the United States Constitution. The rationale of the majority in that case was that the privilege is a bar against compelling "testimony" or "communications" and that the extraction and chemical analysis of blood involves neither. The *Schmerber* decision is subject to no little criticism and its constitutional efficacy is questionable.

The United States Supreme Court was forced in deciding the self-incrimination issue to distinguish the long-recognized case of *Boyd v. United States*, 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524 (1886), which held that the Fifth Amendment bars a state from compelling a person to produce papers he has that might tend to incriminate him. Indeed,

the distinction is as tenuous as the Rochin distinction on the due process issue. *Rochin v. California,* 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952). The observation in one of the dissenting opinions in *Schmerber,* that of Justice Black with whom Justice Douglas joined, is persuasive:

> It is a strange hierarchy of values that allows the State to extract a human being's blood to convict him of a crime because of the blood's content but proscribes compelled production of his lifeless papers. Certainly there could be few papers that would have any more "testimonial" value to convict a man of drunken driving than would an analysis of the alcoholic content of a human being's blood introduced in evidence at a trial for driving while under the influence of alcohol. In such a situation blood, of course, is not oral testimony given by an accused but it can certainly "communicate" to a court and jury the fact of guilt.

384 U.S. at 775.

Several state courts prior to the *Schmerber* decision had held that there was no constitutional difference between requiring submission to chemical tests and coercing words from lips. *E.g., Cox v. State,* 395 P.2d 954 (Okla. Cr. App. 1964); *People v. Knutson,* 17 Ill. App. 2d 251, 149 N.E.2d 461 (1958); *Trammell v. State,* 162 Tex. Crim. 543, 287 S.W.2d 487 (1956).

A case note author in 35 Fordham L. Rev. 131 (1966), stated the anomaly of *Schmerber* on the Fifth Amendment issue as follows at page 137:

> Although *Rochin* has not been overruled, it would now seem to be limited to its narrow facts. This results in a somewhat anomalous situation in light of the Court's adherence to *Boyd.* The Court is apparently willing to provide an individual with greater protection for his private papers than it would provide to an individual for his bodily integrity. It is, as Justice Black noted, a "strange hierarchy of values."

(Footnote omitted.)

The author of a case note in 46 Neb. L. Rev. 161 (1967), characterizes the result of the *Schmerber* decision as follows at page 174:

The Boyd Doctrine, stating that the fourth and fifth amendments run almost into each other, and that the Bill of Rights must be liberally construed, has been placed back upon the shelf subject to being brought down again at a later date.

The majority in *Schmerber* seems to recognize the pitfalls of its own reasoning by deliberately providing that compulsion to take lie detector tests evokes the spirit of the Fifth Amendment.

The case note author in 46 Neb. L. Rev., *supra,* notes in this regard at page 169:

> The distinction between the lie detector and the blood test is most unsatisfactory. Certainly an accused has no power to control the results of the test, but is this a valid inquiry for the purpose of distinguishing a blood test from a lie detector test? Justice Black in his dissent asks: "How can it reasonably be doubted that the blood test evidence was not in all respects the actual equivalent of 'testimony' taken from petitioner when the result of the test was offered as testimony, was considered by the jury as testimony, and the jury's verdict of guilt rests in part on that testimony?"

The terms "testimonial" and "communicative" are far from having clear and precise meanings. Even under their commonly understood meanings, however, blood tests would seem to fall within their meaning. Justice Black noted in *Schmerber v. California, supra* at 774:

> In the first place it seems to me that the compulsory extraction of petitioner's blood for analysis so that the person who analyzed it could give evidence to convict him had both a "testimonial" and a "communicative nature." The sole purpose of this project which proved to be successful was to obtain "testimony" from some person to prove that petitioner had alcohol in his blood at the time he was arrested. And the purpose of the project was certainly "communicative" in that the analysis of the blood was to supply information to enable a witness to communicate to the court and jury that petitioner was more or less drunk.

What is true of a blood test is equally true of a breathalyzer test.

The case note author in 46 Neb. L. Rev., *supra,* notes at page 165 an implication of the *Schmerber* decision:

Finally, the Court concludes that the petitioner's testimonial capacities or communications were in no way implicated because the petitioner was merely a donor, thus suggesting that a legal distinction exists between the cases where an accused actively participates while evidence is compelled from him, and the cases where the accused is only passively involved as the evidence is forced from him.

Insofar as the majority in *Schmerber* bases its decision upon the passivity of the donor of a blood sample in that the blood is extracted from the donor with no active participation on his part, the compulsion to take a breathalyzer test presents a stronger case because some active participation is required.

The state is not merely capturing the air after it leaves the body in the normal process of breathing because a sample of deep lung air is required for the test. To operate the machine, the subject blows into the machine through a mouthpiece until he has emptied his lungs in one breath. The breathalyzer machine traps only the last 52½ cubic centimeters of air that have been blown into it. *State v. Baker,* 56 Wn.2d 846, 851, 355 P.2d 806 (1960). The end result is that air is seized from an individual's lungs which he would not have normally breathed out, analogous to the situation where blood is taken from the veins. Air is a gas and is as much a physical substance as a liquid or a solid. During a breathalyzer test, an individual is not only compelled to breathe out additional air, but also to breathe it into a machine. In this way, an accused is compelled to give evidence against himself.

The testimonial and communicative aspects of the air once analyzed are undeniable in my opinion. Blood tests and breathalyzer tests are clearly distinguishable from physical examination tests for intoxication, such as the finger-to-nose test, because when such observations of a person's body or movements are made, no material substances are taken from his body. Nothing is taken from the person and

the personal dignity is not infringed from an observation of the person or his movements. Our court has properly so held in several cases: *Mercer Island v. Walker*, 76 Wn.2d 607, 458 P.2d 274 (1969); *State v. Duckett*, 73 Wn.2d 692, 440 P.2d 485 (1968); *State v. West*, 70 Wn.2d 751, 424 P.2d 1014 (1967); *State v. Craig*, 67 Wn.2d 77, 406 P.2d 599 (1965). Nevertheless, there is no good reason why evidence in the form of material substance extracted from the body of an individual should not be afforded the same protection as words from his mouth or papers from his desk.

On the Fifth Amendment issue, therefore, it would seem that the better view is expressed by the dissent in *Schmerber*. There is a taking of evidence in chemical tests in the sense that a material substance of the body is being taken which would not otherwise be given up. The evidence is of a testimonial or communicative nature as much as papers from one's desk. If the right not to give evidence against one's self includes the right to refuse to take a breathalyzer test, the right cannot be conditioned upon a penalty such as a 6-month license revocation because this would amount to penalizing the legal exercise of a constitutional right. The privilege against self-incrimination is personal and waiver should not be imposed by the police, the legislature or anyone else upon the individual in whose favor the constitutional protection extends. *Garrity v. New Jersey*, 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967).

Perhaps the true danger of the *Schmerber* decision is not exposed by the strictly analytical approach. The true danger is more fundamental than the apparent inconsistencies with previous decisions which the court was forced to distinguish. The true danger lies in the erosion of dignity and freedoms of the individual which the courts are duty bound to protect. The danger is aptly stated by Justice Black in his dissenting opinion in *Schmerber:*

The refined, subtle reasoning and balancing process used here to narrow the scope of the Bill of Rights' safeguard against self-incrimination provides a handy instrument for further narrowing of that constitutional protection, as well as others, in the future. Believing with the Framers

that these constitutional safeguards broadly construed by independent tribunals of justice provide our best hope for keeping our people free from governmental oppression, I deeply regret the Court's holding.

384 U.S. at 778.

Such approach disregards the duty of courts which has long since been enunciated by the United States Supreme Court in *Boyd v. United States*, 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524 (1886), at page 635:

A close and literal construction [of constitutional provisions for the security of persons and property] deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Nor is this court bound to follow the narrow interpretation of *Schmerber*. The fifth amendment to the United States Constitution contains the phrase "to be a witness." The parallel phrase of article 1, section 9, of the Washington State Constitution employs broader language, "to give evidence." The word "evidence" was chosen by the members of the Washington State Constitutional Convention. In choosing this word, they deliberately rejected the word "testify" (proposed by delegate Allen Weir on July 11), as being inappropriate to express their intended meaning. (Q. S. Smith, The Journal of the Washington State Constitutional Convention 1889 with Analytical Index (1962) at 498, concerning Const. art. 1, § 9.) The word "evidence" in its commonly accepted meaning emcompasses all kinds of evidence, both testimonial and physical. (*See* any standard dictionary; Black's Law Dictionary (4th ed. rev., 1968), p. 656.)

Although this court has had occasion to enunciate a general rule in the cases cited in the majority opinion that the language of the state constitutional provision should receive the same interpretation as that which has been given to the federal provision by the United States Supreme Court, this court has not had occasion to so hold in a

situation where, as here, the provisions are similar in the commonly understood sense. In the cases so decided, the provisions were similar in the dictionary sense of identical, or the intended results of the provisions were clearly identical. Instead of using the term "similar" this court has employed the phrase "substantially identical" in *Texas Co. v. Cohn,* 8 Wn.2d 360, 112 P.2d 522 (1941). The case cited by the majority for the proposition that similar provisions should be construed the same, *State v. Schoel,* 54 Wn.2d 388, 341 P.2d 481 (1959), makes the observation at page 391:

> A comparison of the provisions found in the United States constitution and our state constitution with regard to double jeopardy, reveals that the two are identical in thought, substance, and purpose.

The opinion of the majority should not be taken to mean that the interpretation given to the federal constitution is binding upon the state where the provisions are similar, whatever meaning should be ascribed to the word "similar." In fact, this court has had occasion to hold that it is not bound even where the provisions are identical. *Herr v. Schwager,* 145 Wash. 101, 258 P. 1039 (1927). Nor does the rule enunciated by the majority mean that this court is bound, since it prescribes merely that the state constitutional provision "should" receive the same definition and interpretation as the federal provision.

While it is true that this court has recognized the Schmerber distinction between physical and testimonial evidence on several occasions, the cases cited by the majority do no more than hold that bodily exhibition tests are not within the protection of the constitution. The cases did not involve the use of substance of a person's body against him, such as liquid (blood) or gas (breath).

Probably my disagreement with the holding of the majority stems in most basic form from the statement relating to the interpretation of the state constitution the same as the federal constitution: "There is no compelling justification for its expansion." I would submit, on the other hand,

that the *Schmerber* decision represents an erosion of personal dignity and freedoms guaranteed by the Bill of Rights. From the standpoint of judicial consistency and honesty, there is no good reason why substance extracted from the body should not be given the same constitutional protection as words from the mouth or papers from the desk.

If the right not to give evidence against one's self includes the right to refuse to take a breathalyzer test, the right cannot be conditioned upon a penalty such as a 6-month driver's license suspension. This would amount to penalizing the legal exercise of a constitutional right. Nor should waiver of that constitutional right be effected by police or legislative mandate or anything short of unbridled voluntary consent. The language of the United States Supreme Court in *Garrity v. New Jersey, supra,* at 496-500, is particularly appropriate:

> The choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession . . . can be "mental as well as physical"; "the blood of the accused is not the only hallmark of an unconstitutional inquisition." . . . Subtle pressures . . . may be as telling as coarse and vulgar ones. . . .
>
> . . .
>
> Where the choice is "between the rock and the whirlpool," duress is inherent in deciding to "waive" one or the other.
>
> "It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called." . . .
>
> . . .
>
> There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price.

Thus, since Washington's implied consent laws would penalize any attempt to exercise Fifth Amendment rights in the form of refusal to submit to a breathalyzer test, I would reverse on the basis that the evidence admitted against

defendant constituted an infringement of his rights against self-incrimination under the Washington State Constitution. This result is not avoided by the reasoning of the majority that even if there were no true consent to the test in this case, there would be no Fifth Amendment defect because the chemical test is constitutional on another ground, as a reasonable exercise of the state's police power. Such reasoning is a non sequitur in the sense that a statute must survive all constitutional attacks rather than just one attack to be constitutional. Otherwise, the application of the police power test of a reasonably conceived state of facts justifying the legislation would be the only test for a statute to be declared constitutional in all respects despite whatever constitutional objections might be asserted. Nor is this result avoided by the rule that this court will construe a statute, where possible, so as to render it valid, since such construction is not possible in reference to implied consent statutes which clearly provide a penalty for refusal to submit to the breathalyzer test.

Since I believe there is "compelling justification for . . . expansion" of Washington's constitutional provision against self-incrimination beyond the boundaries proscribed for the federal provision, I respectfully dissent.

McGOVERN, J., and DONWORTH, J. Pro Tem., concur in the result of the dissent.